FORD MOTOR CO. *v.* EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

No. 81–300.   Argued April 20, 1982—Decided June 28, 1982

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 241.

*John R. Wester* argued the cause for petitioner. With him on the briefs were *Robert L. Stern, H. R. Nolte, Jr.,* and *Stephen D. Bolerjack.*

*David A. Strauss* argued the cause *pro hac vice* for respondent. With him on the brief were *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Wallace, Michael J. Connolly, Philip B. Sklover,* and *Vella M. Fink.**

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the question whether an employer charged with discrimination in hiring can toll the continuing accrual of backpay liability under § 706(g) of Title VII, 42 U. S. C. § 2000e–5(g), simply by unconditionally offering the claimant the job previously denied, or whether the employer also must offer seniority retroactive to the date of the alleged discrimination.[1]

---

*Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

[1] The dissent asserts that by so "fram[ing] the question presented" we have "simply and completely misstate[d] the issue." *Post,* at 242. Apparently, neither party agrees with the dissent. The petitioner summarizes the question presented as "whether back pay due an employment discrimination claimant continues to accrue after the claimant has rejected an unconditional job offer that does not include retroactive seniority or back pay." Brief for Petitioner i. The respondent sums up the question presented as "[w]hether an employer who unlawfully refused to hire job applicants because they were women can terminate its liability for back pay by

The question has considerable practical significance because of the lengthy delays that too often attend Title VII litigation.[2] The extended time it frequently takes to obtain satisfaction in the courts may force a discrimination claimant to suffer through years of underemployment or unemployment before being awarded the job the claimant deserves. Court delays, of course, affect all litigants. But for the victim of job discrimination, delay is especially unfortunate. The claimant cannot afford to stand aside while the wheels of justice grind slowly toward the ultimate resolution of the lawsuit. The claimant needs work that will feed a family and restore self-respect. A job is needed—now. In this case, therefore, we must determine how best to fashion the remedies available under Title VII to fulfill this basic need.

## I

### A

In June and July 1971, Judy Gaddis, Rebecca Starr, and Zettie Smith applied at a Ford Motor Co. (Ford) parts warehouse located in Charlotte, N. C., for jobs as "picker-packers," "picking" ordered parts from storage, and "packing" them for shipment. At the time, no woman had ever worked in that capacity at the Ford warehouse. All three women

---

subsequently offering the applicants positions without seniority at a time when they had obtained, and accumulated seniority in, other jobs." Brief for Respondent i.

To buttress the assertion that the Court has addressed a question not presented, the dissent claims that we have "misrea[d]" the Court of Appeals' decision, "transform[ing] a narrow Court of Appeals ruling into a broad one, just so [we could] reverse and install a broad new rule of [our] own choosing," *post*, at 249, n. 8, rather than attempt, as best we are able, to decide the particular case actually before us. Because we believe we have correctly and fairly framed the question, we decline the opportunity to address further this *ad hominem* argument.

[2] The discriminatory refusals to hire involved in this case occurred 11 years ago.

were qualified for the positions: Gaddis and Starr recently had been laid off from equivalent jobs at a nearby General Motors (GM) warehouse, and Smith had comparable prior experience. Smith applied before any of the openings were filled, and Gaddis and Starr applied while at least two positions remained available.[3] Ford, however, filled the three vacant positions with men, and Gaddis filed a charge with the federal Equal Employment Opportunity Commission (EEOC), claiming that Ford had discriminated against her because of her sex.[4]

In January 1973, GM recalled Gaddis and Starr to their former positions at its warehouse. The following July, while they were still working at GM, a single vacancy opened up at Ford. Ford offered the job to Gaddis, without seniority retroactive to her 1971 application. Ford's offer, however, did not require Gaddis to abandon or compromise her Title VII claim against Ford. Gaddis did not accept the job, in part because she did not want to be the only woman working at the warehouse, and in part because she did not want to lose the seniority she had earned at GM. Ford then made the same unconditional offer to Starr, who declined for the same reasons. Gaddis and Starr continued to work at the GM warehouse, but in 1974 the warehouse was closed and they were laid off. They then unsuccessfully sought new employment until September 1975, when they entered a Government training program for the unemployed.

Smith applied again for work at Ford in 1973, but was never hired. She worked elsewhere, though at lower wages

---

[3] When this case came to trial, Ford claimed that Gaddis and Starr applied after men had already been hired and that Smith had not applied at all. The District Court found to the contrary, however, and the Court of Appeals upheld the findings.

[4] After Gaddis had filed her complaint, she and Starr continued to seek work at the Ford warehouse. In November 1972, Ford hired them and four other workers for six weeks to fill temporary jobs at the warehouse.

than she would have earned at Ford, during much of the time between 1971 and the District Court's decision in 1977.

In contrast to Gaddis', Starr's, and Smith's difficulties, at least two of the three men hired by Ford in 1971 were still working at the warehouse at the time of the trial in 1977.

## B

In July 1975, the EEOC sued Ford in the United States District Court for the Western District of North Carolina, alleging that Ford had violated Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV), by refusing to hire women at the Charlotte warehouse. The Commission sought injunctive relief and backpay for the victims.[5]

After trial, the District Court found that Ford had discriminated against the three women on the basis of their sex and awarded them backpay in an amount equal to "the difference between the amount they would have earned had they been hired in August 1971, and the amounts actually earned or reasonably earnable by them" between that date and the date of the court's order. App. to Pet. for Cert. A–170. The District Court rejected Ford's contention that Gaddis and Starr were not entitled to backpay accruing after the dates on which they declined Ford's offer of employment. *Id.*, at A–170 to A–171.

The United States Court of Appeals for the Fourth Circuit affirmed the District Court's finding of unlawful discrimination, as well as the court's award to Gaddis and Starr of backpay that had accrued after July 1973, when the women rejected Ford's unconditional job offer. 645 F. 2d 183 (1981). The court suggested that, had Ford promised retroactive seniority with its job offer, the offer would have cut off

---

[5] Although the EEOC suit involved additional issues and claimants, we are concerned here with only the part of the suit that involved Gaddis, Starr, and Smith.

Ford's backpay liability. The court concluded, however, that without the promise of retroactive seniority, Ford's 1973 offer was "incomplete and unacceptable." *Id.*, at 193.[6]

Ford then petitioned this Court for a writ of certiorari, contending, *inter alia*, that its unconditional job offer to Gaddis and Starr should have cut off the further accrual of backpay liability.[7] We granted the writ. 454 U. S. 1030 (1981).

---

[6] Senior District Judge Walter E. Hoffman, sitting by designation, dissented from this portion of the Court of Appeals' decision.

[7] In its petition Ford raised two other issues. First, Ford read the opinion of the Court of Appeals as suggesting that to toll backpay liability an employer must include with his job offer, not just retroactive seniority, but also an offer of already-accrued backpay. The Court of Appeals' opinion did not expressly so hold, however, and before this Court the EEOC concedes that under Title VII such an offer of a lump-sum payment of backpay is not required to toll the continuing accrual of backpay liability. This issue thus is no longer contested by the parties.

The second issue is the only one involving Smith. Ford disputed the District Court's finding that Ford discriminated against the three women, claiming that the court reached its conclusion because it erroneously allocated the burden of proof. We are persuaded, however, that the District Court's findings were consistent with *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981).

In *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. See also *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567 (1978), and *Board of Trustees* v. *Sweeney*, 439 U. S. 24 (1978). Despite these decisions, some confusion continued to exist. In *Burdine* we reiterated that after a plaintiff has proved a prima facie case of discrimination, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" 450 U. S., at 253 (citation omitted). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Ibid.* (citation omitted). It was then made clear that:

"The defendant need not persuade the Court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence

## II

Section 706(g) of the Civil Rights Act of 1964, 78 Stat. 261, as amended, 42 U. S. C. § 2000e–5(g), governs the award of backpay in Title VII cases. In pertinent part, § 706(g) provides:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the

---

raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.*, at 254–255 (footnote omitted).

As neither the District Court nor the Court of Appeals cited *Burdine* (apparently because it had only recently been decided), we restate the foregoing principles. We conclude, however, on the basis of the specific findings of fact by the District Court, undisturbed by the Court of Appeals, that the plaintiffs in this case carried their burden of persuasion.

As *Burdine* commands, the District Court did not place the burden of persuasion on Ford. Instead, it began its discussion of liability by straightforwardly declaring that the EEOC "ha[d] established that Ford discriminated against Smith, Gaddis and Starr on the basis of their sex." App. to Pet. for Cert. A–167. The court supported this conclusion by pointing, not only to the EEOC's proof of a prima facie case, but also to "its showing that Ford had never hired women into the warehouse until November, 1972, and that [its] procedures for hiring were vague and were based on highly subjective criteria." *Id.*, at A–167 to A–168. The court, moreover, entered findings of fact discrediting each of Ford's proffered justifications for refusing to hire the women. *Id.*, at A–155 to A–161. This progression of factual findings and legal conclusions indicates that the District Court found by a preponderance of the evidence that Ford's justifications were "unworthy of credence," 450 U. S., at 256, and that the company had discriminated on the basis of sex. These findings are fully consistent with *Burdine*.

As Ford points out, the Court of Appeals opinion contains some statements that are arguably inconsistent with *Burdine*. That court corrected any misimpression generated by these statements, however, with a discussion directly focusing on the burden-of-proof issue. 645 F. 2d 183, 189, n. 5 (CA4 1981). In light of this discussion, and because it is clear that the trier of fact properly allocated the burden of proof, we find no merit in Ford's burden-of-proof argument.

court *may* enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as *may* be appropriate, which *may* include, but is not limited to, . . . hiring of employees, *with or without* back pay, . . . or any other equitable relief as the court deems appropriate. . . . Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against *shall* operate to reduce the back pay otherwise allowable" (emphasis added).[8]

Under § 706(g), then, "backpay is not an automatic or mandatory remedy; . . . it is one which the courts 'may' invoke" in the exercise of their sound "discretion [which] is equitable in nature." *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 415, 416 (1975). Nonetheless, while "the power to award backpay is a discretionary power," *id.*, at 447 (BLACKMUN, J., concurring in judgment), a "court must exercise this power 'in light of the large objectives of the Act,'" and, in doing so, must be guided by "meaningful standards" enforced by "thorough appellate review." *Id.*, at 416 (opinion of the Court) (citations omitted). Moreover, as we emphasized in *Albemarle Paper*, in Title VII cases

"such discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to

---

[8] Section 706(g) was "expressly modeled," *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 419, and n. 11 (1975), on the analogous remedial provision of the National Labor Relations Act (NLRA), § 10(c), 49 Stat. 454, as amended, 29 U. S. C. § 160(c). Section 10(c) provides that, if an unfair labor practice has been, or is being, committed, the National Labor Relations Board (NLRB) is empowered to "take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act.

The principles developed under the NLRA generally guide, but do not bind, courts in tailoring remedies under Title VII. See, *e. g., Teamsters* v. *United States*, 431 U. S. 324, 366–367 (1977); *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 768–770 (1976); *Albemarle Paper Co., supra*, at 419, and n. 11. Therefore, throughout this opinion we refer to cases decided under the NLRA as well as under Title VII.

be guided by sound legal principles.' *United States* v. *Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (CC Va. 1807) (Marshall, C. J.). . . .

"It is true that '[e]quity eschews mechanical rules . . . [and] depends on flexibility.' *Holmberg* v. *Armbrecht*, 327 U. S. 392, 396 (1946). But when Congress invokes the Chancellor's conscience to further transcendent legislative purposes, what is required is the principled application of standards consistent with those purposes and not 'equity [which] varies like the Chancellor's foot.' Important national goals would be frustrated by a regime of discretion that 'produce[d] different results for breaches of duty in situations that cannot be differentiated in policy.' *Moragne* v. *States Marine Lines*, 398 U. S. 375, 405 (1970)." *Id.*, at 416–417 (footnote omitted).

In this case, Ford and the EEOC offer competing standards to govern backpay liability. Ford argues that if an employer unconditionally offers a claimant the job for which he previously applied, the claimant's rejection of that offer should toll the continuing accrual of backpay liability.[9] The EEOC, on the other hand, defends the lower court's rule,[10]

---

[9] It should be clear that the contested backpay in this suit stems from the period following Ford's offer, and during which Gaddis and Starr were unemployed, *i. e.*, after the GM warehouse closed. Our decision today does not affect their right to claim backpay for the period before they rejected Ford's offers.

[10] For reasons of its own, the dissenting opinion reads the decision below narrowly and takes us to task for discerning the outlines of a "general rule" *post*, at 248 (emphasis deleted), in the opinion of the Court of Appeals. In this regard, we note that already at least one District Court evidently not only has read the opinion below as prescribing a general rule, but in addition has interpreted that rule more broadly than we do. See *Saunders* v. *Hercules, Inc.*, 510 F. Supp. 1137, 1142 (WD Va. 1981) ("in view of the recent Fourth Circuit Court of Appeals decision in *Equal Employment Opportunity Commission* v. *Ford Motor Company*, 645 F. 2d 183 (4th Cir. 1981) . . . [i]t is clear . . . that a person who has been discriminated against does not have to accept an offer of reemployment where back pay has not been offered").

contending that backpay liability should be tolled only by the rejection of an offer that includes seniority retroactive to the date on which the alleged discrimination occurred. Our task is to determine which of these standards better coincides with the "large objectives" of Title VII.

## III

The "primary objective" of Title VII is to bring employment discrimination to an end, *Albemarle Paper*, 422 U. S., at 417, by "'achiev[ing] equality of employment opportunities and remov[ing] barriers that have operated in the past to favor an identifiable group . . . over other employees.'" *Ibid.* (quoting *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–430 (1971)). See also *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 800 (1973). "[T]he preferred means for achieving" this goal is through "[c]ooperation and voluntary compliance." *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 44 (1974).

To accomplish this objective, the legal rules fashioned to implement Title VII should be designed, consistent with other Title VII policies, to encourage Title VII defendants promptly to make curative, unconditional job offers to Title VII claimants, thereby bringing defendants into "voluntary compliance" and ending discrimination far more quickly than could litigation proceeding at its often ponderous pace. Delays in litigation unfortunately are now commonplace, forcing the victims of discrimination to suffer years of underemployment or unemployment before they can obtain a court order awarding them the jobs unlawfully denied them. In a better world, perhaps, lawsuits brought under Title VII would speed to judgment so quickly that the effects of legal rules on the behavior of the parties during the pendency of litigation would not be as important a consideration. We do not now live in such a world, however, as this case illustrates.

The rule tolling the further accrual of backpay liability if the defendant offers the claimant the job originally sought

well serves the objective of ending discrimination through voluntary compliance, for it gives an employer a strong incentive to hire the Title VII claimant. While the claimant may be no more attractive than the other job applicants, a job offer to the claimant will free the employer of the threat of liability for further backpay damages. Since paying backpay damages is like paying an extra worker who never came to work, Ford's proposed rule gives the Title VII claimant a decided edge over other competitors for the job he seeks.

The rule adopted by the court below, on the other hand, fails to provide the same incentive, because it makes hiring the Title VII claimant more costly than hiring one of the other applicants for the same job. To give the claimant retroactive seniority before an adjudication of liability, the employer must be willing to pay the additional costs of the fringe benefits that come with the seniority that newly hired workers usually do not receive. More important, the employer must also be prepared to cope with the deterioration in morale, labor unrest, and reduced productivity that may be engendered by inserting the claimant into the seniority ladder over the heads of the incumbents who have earned their places through their work on the job. In many cases, moreover, disruption of the existing seniority system will violate a collective-bargaining agreement, with all that such a violation entails for the employer's labor relations.[11] Under the rule adopted by the court below, the employer must be willing to accept all these additional costs if he hopes to toll his backpay liability by offering the job to the claimant. As a result, the employer will be less, rather than more, likely to hire the claimant.

In sum, the Court of Appeals' rule provides no incentive to employers to hire Title VII claimants. The rule advocated

---

[11] See *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 76 (1982) ("Seniority provisions are of 'overriding importance' in collective bargaining, . . . and they 'are universally included in these contracts'") (quoting *Humphrey* v. *Moore*, 375 U. S. 335, 346 (1964), and *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 79 (1977)).

by Ford, by contrast, powerfully motivates employers to put Title VII claimants to work, thus ending ongoing discrimination as promptly as possible.[12]

## IV

Title VII's primary goal, of course, *is* to end discrimination; the victims of job discrimination want jobs, not lawsuits.[13] But when unlawful discrimination does occur, Title VII's secondary, fallback purpose is to compensate the victims for their injuries. To this end, § 706(g) aims " 'to make the victims of unlawful discrimination whole' " by restoring them, " 'so far as possible . . . to a position where they would have been were it not for the unlawful discrimination.' " *Albemarle Paper*, 422 U. S., at 421 (quoting 118 Cong. Rec. 7168 (1972) (remarks of Sen. Williams)). We now turn to consider whether the rule urged by Ford not only better serves the goal of ending discrimination, but also properly compensates injured Title VII claimants.

### A

If Gaddis and Starr had rejected an unconditional offer from Ford before they were recalled to their jobs at GM, toll-

---

[12] In his dissent, JUSTICE BLACKMUN suggests that it is we who speak from the "comfor[t]" of the "sidelines," *post*, at 256, somewhere outside "the real world," *ibid.*, of sex discrimination. For all the dissent's rhetoric, however, nowhere does the dissent seriously challenge our conclusion that the rule we adopt will powerfully motivate employers to offer Title VII claimants the jobs they have been denied. But Rebecca Starr's trial testimony eloquently explains what claimants need: "I was just wanting that job so bad because you can't, a woman, when you've got three children, I needed the money, and I was wanting the job so bad." 4 Tr. 356. Thus, it is the rule applied by the court below which manifests a "studied indifference to the real-life concerns," *post*, at 255, of the victims of sex discrimination.

[13] See 118 Cong. Rec. 7569 (1972) (remarks of Rep. Dent during debate on 1972 amendments to Title VII) ("Most people just want to work. That is all. They want an opportunity to work. We are trying to see that all of us, no matter of what race, sex, or religious or ethnic background, will have equal opportunity in employment").

ing Ford's backpay liability from the time of Ford's offer plainly would be consistent with providing Gaddis and Starr full compensation for their injuries. An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g).[14] This duty, rooted in an ancient principle of law,[15] requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position,[16] he

---

[14] The provision expressly states that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U. S. C. § 2000e–5(g).

Claimants often take other lesser or dissimilar work during the pendency of their claims, even though doing so is not mandated by the statutory requirement that a claimant minimize damages or forfeit his right to compensation. See, e. g., Merriweather v. Hercules, Inc., 631 F. 2d 1161 (CA5 1980) (voluntary minimization of damages in dissimilar work); Thornton v. East Texas Motor Freight, 497 F. 2d 416, 422 (CA6 1974) (voluntary minimization of damages by moonlighting).

[15] See generally, e. g., C. McCormick, Law of Damages 127–158 (1935). McCormick summarizes "the general rule" as follows: "Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damage which could thus have been avoided." Id., at 127.

In connection with the remedial provisions of the NLRA, we said: "Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces. Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred." Phelps Dodge Corp. v. NLRB, 313 U. S. 177, 197–198 (1941).

[16] See, e. g., NLRB v. Madison Courier, Inc., 153 U. S. App. D. C. 232, 245–246, 472 F. 2d 1307, 1320–1321 (1972) (employee need not "seek employment which is not consonant with his particular skills, background, and experience" or "which involves conditions that are substantially more onerous than his previous position"); Wonder Markets, Inc., 236 N. L. R. B. 787, 787 (1978) (offer of reinstatement ineffective when discharged em-

forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied.[17] Consequently, an employer charged with unlawful discrimination often can toll the accrual of backpay liability by unconditionally offering the claimant the job he sought, and thereby providing him with an opportunity to minimize damages.[18]

An employer's unconditional offer of the job originally sought to an unemployed or underemployed claimant, moreover, need not be supplemented by an offer of retroactive seniority to be effective, lest a defendant's offer be irrationally disfavored relative to other employers' offers of substantially similar jobs. The claimant, after all, plainly would be required to minimize his damages by accepting another em-

---

ployee offered a different job, though former position still existed), enf'd, 598 F. 2d 666, 676 (CA1 1979), supplemental decision, 249 N. L. R. B. 294 (1980); *Good Foods Manufacturing & Processing Corp.*, 195 N. L. R. B. 418, 419 (1972) (offer of reinstatement ineffective because job offered had different conditions of employment and benefits), supplemental decision, 200 N. L. R. B. 623 (1972), enf'd, 492 F. 2d 1302 (CA7 1974); *Harvey Carlton*, 143 N. L. R. B. 295, 304 (1963) (offer of reinstatement ineffective because employees would return on probation).

Some lower courts have indicated, however, that after an extended period of time searching for work without success, a claimant must consider taking a lower-paying position. See, *e. g.*, *NLRB* v. *Madison Courier, Inc.*, *supra*, at 245–246, 472 F. 2d, at 1320–1321; *NLRB* v. *Southern Silk Mills, Inc.*, 242 F. 2d 697, 700 (CA6), cert. denied, 355 U. S. 821 (1957). If the claimant decides to go into a dissimilar line of work, or to accept a demotion, his earnings must be deducted from any eventual backpay award. See § 706(g); *Merriweather* v. *Hercules, Inc.*, *supra*, at 1168; *Taylor* v. *Philips Industries, Inc.*, 593 F. 2d 783, 787 (CA7 1979) *(per curiam)*.

[17] *NLRB* v. *Arduini Mfg. Corp.*, 394 F. 2d 420 (CA1 1968).

[18] The claimant's obligation to minimize damages in order to retain his right to compensation does not require him to settle his claim against the employer, in whole or in part. Thus, an applicant or discharged employee is not required to accept a job offered by the employer on the condition that his claims against the employer be compromised. See, *e. g.*, *NLRB* v. *St. Marys Sewer Pipe Co.*, 146 F. 2d 995, 996 (CA3 1945).

ployer's offer even though it failed to grant the benefits of seniority not yet earned.[19] Of course, if the claimant fulfills the requirement that he minimize damages by accepting the defendant's unconditional offer, he remains entitled to full compensation if he wins his case.[20] A court may grant him backpay accrued prior to the effective date of the offer,[21] retroactive seniority,[22] and compensation for any losses suf-

---

[19] For the same reasons, a defendant's job offer is effective to force minimization of damages by an unemployed or underemployed claimant even without a supplemental offer of backpay, since the claimant would be required to accept another employer's offer of a substantially similar job without a large front-end, lump-sum bonus. See, e. g., *NLRB* v. *Midwest Hanger Co.*, 550 F. 2d 1101, 1103 (CA8) ("It is clear that had the Company's offer of reinstatement been conditioned solely on its refusal to give back pay, as the Company strenuously argues, then the offer of reinstatement would not have been invalidated"), cert. denied, 434 U. S. 830 (1977); *Reliance Clay Products Co.*, 105 N. L. R. B. 135, 137 (1953) ("The Board has consistently held that a discriminatorily discharged employee may not refuse" an unconditioned offer of reinstatement even though unaccompanied by backpay; refusal of such an offer tolls the employer's liability for backpay).

[20] In tailoring a Title VII remedy a court " 'has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 418 (quoting *Louisiana* v. *United States*, 380 U. S. 145, 154 (1965)).

[21] See, e. g., *NLRB* v. *Huntington Hospital, Inc.*, 550 F. 2d 921, 924 (CA4 1977).

[22] See, e. g., *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385 (1982); *Teamsters* v. *United States*, 431 U. S. 324 (1977); *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 (1976).

Decisions construing the remedial provision of the NLRA, § 10(c), 29 U. S. C. § 160(c), are in accord. See, e. g., *In re Nevada Consolidated Copper Corp.*, 26 N. L. R. B. 1182, 1235 (1940) (persons unlawfully refused jobs must be offered jobs with "any seniority or other rights and privileges they would have acquired, had the respondent not unlawfully discriminated against them") (quoted in *Franks* v. *Bowman Transportation Co.*, supra, at 770), enf. denied, 122 F. 2d 587 (CA10 1941), rev'd, 316 U. S. 105 (1942).

fered as a result of his lesser seniority before the court's judgment.[23]

In short, the unemployed or underemployed claimant's statutory obligation to minimize damages requires him to accept an unconditional offer of the job originally sought, even without retroactive seniority. Acceptance of the offer preserves, rather than jeopardizes, the claimant's right to be made whole; in the case of an unemployed or underemployed claimant, Ford's suggested rule merely embodies the existing requirement of § 706(g) that the claimant minimize damages, without affecting his right to compensation.

## B

Ford's proposed rule also is consistent with the policy of full compensation when the claimant has had the good fortune to find a more attractive job than the defendant's, because the availability of the better job terminates the ongoing ill effects of the defendant's refusal to hire the claimant. For example, if Gaddis and Starr considered their jobs at GM to be so far superior to the jobs originally offered by Ford that, even if Ford had hired them at the outset, they would have left Ford's employ to take the new work, continuing to hold Ford responsible for backpay after Gaddis and Starr lost their GM jobs would be to require, in effect, that Ford insure them against the risks of unemployment in a new and independent undertaking. Such a rule would not merely restore Gaddis and Starr to the "'position where they would have been were it not for the unlawful discrimination,'" *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 421 (citation omitted); it would catapult them into a better position than they would have enjoyed in the absence of discrimination.

Likewise, even if Gaddis and Starr considered their GM jobs only somewhat better or even substantially equivalent to the positions they would have held at Ford had Ford hired

---

[23] Both Ford and the EEOC agree on this point. See Brief for Respondent 19; Reply Brief for Petitioner 9.

them initially,[24] their rejection of Ford's unconditional offer could be taken to mean that they believed that the lingering ill effects of Ford's prior refusal to hire them had been extinguished by later developments. If, for example, they thought that the Ford and GM jobs were identical in every respect, offering identical pay, identical conditions of employment, and identical risks of layoff, Gaddis and Starr would have been utterly indifferent as to which job they had—Ford's or GM's. Assuming that they could work at only one job at a time, the ongoing economic ill effects caused by Ford's prior refusal to hire them would have ceased when they found the identical jobs at GM, and they would have had no reason to accept Ford's offers. As in the case of a claimant who lands a better job, therefore, requiring a defendant to provide what amounts to a form of unemployment insurance to claimants, after they have found identical jobs and refused the defendant's unconditional job offer, would be, absent special circumstances, to grant them something more than compensation for their injuries.

In both of these situations, the claimant has the power to accept the defendant's offer and abandon the superior or substantially equivalent replacement job. As in the case of an unemployed or underemployed claimant, under the rule advocated by Ford acceptance of the defendant's unconditional offer would preserve fully the ultimately victorious claimant's right to full redress for the effects of discrimination.[25] The claimant who chooses not to follow this path does so, then, not because it provides inadequate compensation, but be-

---

[24] It is possible that they did so value the GM jobs, since they applied at Ford only after being laid off at GM, and since after being recalled to the GM jobs they rejected Ford's offer. Therefore, contrary to the dissent's erroneous suggestion, *post*, at 253, the possibility that Gaddis and Starr considered their GM jobs superior to the positions they would have had at Ford had Ford hired them at the outset is not merely a "hypothetical case." We cannot infer that they so valued their GM jobs, however, solely from their rejection of Ford's offer.

[25] See discussion *supra*, at 232–234.

cause the value of the replacement job outweighs the value of the defendant's job supplemented by the prospect of full court-ordered compensation. In other words, the victim of discrimination who finds a better or substantially equivalent job no longer suffers ongoing injury stemming from the unlawful discrimination.

C

Thus, the rule advocated by Ford rests comfortably both on the statutory requirement that a Title VII claimant must minimize damages and on the fact that a claimant is no longer incurring additional injury if he has been able to find other suitable work that, all things considered, is at least as attractive as the defendant's. For this reason, in almost all circumstances the rule is fully consistent with Title VII's object of making injured claimants whole.

The sole question that can be raised regarding whether the rule adequately compensates claimants arises in that narrow category of cases in which the claimant believes his replacement job to be superior to the defendant's job without seniority, but inferior to the defendant's job with the benefits of seniority. In the present case, for example, it is possible that Gaddis and Starr considered their GM jobs more attractive than the jobs offered by Ford, but less satisfactory than the positions they would have held at Ford if Ford had hired them initially. If so, they were confronted with two options. They could have accepted Ford's unconditional offer, preserving their right to full compensation if they prevailed on their Title VII claims, but forfeiting their favorable positions at GM. Alternatively, they could have kept their jobs at GM, retaining the possibility of continued employment there, but, under the operation of the rule advocated here by Ford, losing the right to claim further backpay from Ford after the date of Ford's offer. The court below concluded that under these circumstances Ford's rule would present Gaddis and Starr with an "intolerable choice," 645 F. 2d, at 192, depriving them of the opportunity to receive full compensation.

We agree that Gaddis and Starr had to choose between two alternatives. We do not agree, however, that their opportunity to choose deprived them of compensation. After all, they had the option of accepting Ford's unconditional offer and retaining the right to seek full compensation at trial, which would comport fully with Title VII's goal of making discrimination victims whole. Under the rule advocated by Ford, if Gaddis and Starr chose the option of remaining at their GM jobs rather than accept Ford's offer, it was because they thought that the GM jobs, plus their claims to backpay accrued prior to Ford's offer, were *more* valuable to them than the jobs they originally sought from Ford, plus the right to seek full compensation from the court.[26] It is hard to see how Gaddis and Starr could have been deprived of adequate compensation because they chose to venture upon a path that seemed to them more attractive than the Ford job plus the right to seek full compensation in court.

---

[26] Employees value a job for many reasons besides the rate of pay, including, for example, the presence of other workers of the employee's own sex, the availability of recreational facilities at the worksite, staggered work hours, better health benefits, longer vacations, and so forth. What makes one job better than another varies from one employee to another.

Gaddis and Starr presumably rejected Ford's offer because they thought their jobs at GM were worth more to them than full compensation (Ford's offer plus a court award) discounted by the risks of litigation. In essence, the position adopted by the court below and advocated here by the EEOC turns on the fact that we cannot be sure that, had Gaddis and Starr known they were going to win their lawsuit, they still would have rejected Ford's offer. Had they known they were going to win, of course, they would have rejected the Ford job only if they valued the GM jobs more than they valued the combination of Ford's job plus the value of court-ordered compensation *un*discounted by the risks of litigation. To agree with the EEOC is, in effect, to contend that a claimant is not made whole for purposes of Title VII unless he decided to stay at a replacement job that was worth to him more than the sum of (1) the defendant's job, (2) the right to seek full court-ordered compensation, and, in addition, (3) a sum analogous to insurance against the risk of loss at trial. We discern, however, no reason for concluding that Title VII requires the defendant to insure the claimant against the possibility that the defendant might prevail in the lawsuit.

If the choice presented to Gaddis and Starr was difficult, it was only because it required them to assess their likelihood of prevailing at trial. But surely it cannot be contended for this reason alone that they were deprived of their right to adequate compensation. It is a fact of life that litigation is risky and that a plaintiff with a claim to compensation for his losses must consider the possibility that the claim might be lost at trial, either wrongly, because of litigation error, or rightly, because the defendant was innocent. Ford's rule merely requires the Title VII claimant to decide whether to take the job offered by the defendant, retaining his rights to an award by the court of backpay accrued prior to the effective date of the offer, and any court-ordered retroactive seniority plus compensation for any losses suffered as a result of his lesser seniority before the court's judgment, or, instead, whether to accept a more attractive job from another employer and the limitation of the claim for backpay to the damages that have already accrued. The rule urged by the EEOC and adopted by the court below, by contrast, would have the perverse result of requiring the employer in effect to insure the claimant against the risk that the employer might win at trial.

Therefore, we conclude that, when a claimant rejects the offer of the job he originally sought, as supplemented by a right to full court-ordered compensation, his choice can be taken as establishing that he considers the ongoing injury he has suffered at the hands of the defendant to have been ended by the availability of better opportunities elsewhere. For this reason, we find that, absent special circumstances,[27] the

---

[27] If, for example, the claimant has been forced to move a great distance to find a replacement job, a rejection of the employer's offer might reflect the costs of relocation more than a judgment that the replacement job was superior, all things considered, to the defendant's job. In exceptional circumstances, the trial court, in the exercise of its sound discretion, could give weight to such factors when deciding whether backpay damages ac-

simple rule that the ongoing accrual of backpay liability is tolled when a Title VII claimant rejects the job he originally sought comports with Title VII's policy of making discrimination victims whole.

## V

Although Title VII remedies depend primarily upon the objectives discussed above, the statute also permits us to consider the rights of "innocent third parties." *City of Los Angeles Department of Water & Power* v. *Manhart,* 435 U. S. 702, 723 (1978). See also *Teamsters* v. *United States,* 431 U. S. 324, 371–376 (1977). The lower court's rule places a particularly onerous burden on the innocent employees of an employer charged with discrimination. Under the court's rule, an employer may cap backpay liability only by forcing his incumbent employees to yield seniority to a person who has not proved, and may never prove, unlawful discrimination. As we have acknowledged on numerous occasions, seniority plays a central role in allocating benefits and burdens among employees.[28] In light of the "'overriding impor-

---

crued after the rejection of an employer's offer should be awarded to the claimant.

The dissent attempts to characterize "the loss of their accumulated seniority at [a] replacement jo[b]" as such a cost of relocation. *Post,* at 252–253, n. 11. By so doing, the dissent simply confuses the costs of changing from one job to another—whatever the respective advantages and disadvantages of the two jobs might be—with the differences between the two jobs.

[28] Seniority may govern, "'not only promotion and layoff, but also transfer, demotion, rest days, shift assignments, prerogative in scheduling vacation, order of layoff, possibilities of lateral transfer to avoid layoff, 'bumping' possibilities in the face of layoff, order of recall, training opportunities, working conditions, length of layoff endured without reducing seniority, length of layoff recall rights will withstand, overtime opportunities, parking privileges, and [even] a preferred place in the punch-out line.'" *Franks* v. *Bowman Transportation Co.,* 424 U. S., at 766–767 (quoting Stacy, Title VII Seniority Remedies in a Time of Economic Downturn, 28 Vand. L. Rev. 487, 490 (1975)).

tance'" of these rights, *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 76 (1982) (quoting *Humphrey* v. *Moore*, 375 U. S. 335, 346 (1964)), we should be wary of any rule that encourages job offers that compel innocent workers to sacrifice their seniority to a person who has only claimed, but not yet proved, unlawful discrimination.

The sacrifice demanded by the lower court's rule, moreover, leaves the displaced workers without any remedy against claimants who fail to establish their claims. If, for example, layoffs occur while the Title VII suit is pending, an employer may have to furlough an innocent worker indefinitely while retaining a claimant who was given retroactive seniority. If the claimant subsequently fails to prove unlawful discrimination, the worker unfairly relegated to the unemployment lines has no redress for the wrong done him. We do not believe that "'the large objectives'" of Title VII, *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 416 (citation omitted), require innocent employees to carry such a heavy burden.[29]

---

[29] In addition to the rights of innocent employees, the rule urged by the EEOC and adopted by the court below burdens innocent employers. An innocent employer—or one who believes himself innocent—has the right to challenge in court claims he considers weak or baseless. The approach endorsed by the lower court undermines this right by requiring the employer, if he wishes to offer some relief to the claimant and toll the mounting backpay bill, to surrender his defense to the charge that the claimant is entitled to retroactive seniority. If the employer offers the claimant retroactive seniority as well as a job, and then prevails at trial, he will have no recourse against the claimant for the costs of the retroactive seniority that the claimant erroneously received. The rule urged by Ford permits the parties to stem the ongoing effects of the alleged discrimination without compelling either claimant or employer to compromise his claims or surrender his defenses. Cf. *Moro Motors Ltd.*, 216 N. L. R. B. 192, 193 (1975) ("were [an employer] required to offer to an employee, allegedly discharged for discriminatory reasons, reinstatement *with accrued back pay*, the [employer's] right to litigate the issue of whether the discharge was unlawful would for all practical purposes be nullified") (emphasis in original); *National Screen Products Co.*, 147 N. L. R. B. 746, 747–748 (1964).

## VI

In conclusion, we find that the rule adopted by the court below disserves Title VII's primary goal of getting the victims of employment discrimination into the jobs they deserve as quickly as possible. The rule, moreover, threatens the interests of other, innocent employees by disrupting the established seniority hierarchy, with the attendant risk that an innocent employee will be unfairly laid off or disadvantaged because a Title VII claimant unfairly has been granted seniority.

On the other hand, the rule that a Title VII claimant's rejection of a defendant's job offer normally ends the defendant's ongoing responsibility for backpay suffers neither of these disadvantages, while nevertheless adequately satisfying Title VII's compensation goals. Most important, it also serves as a potent force on behalf of Title VII's objective of bringing discrimination to an end more quickly than is often possible through litigation. For these reasons we hold that, absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability. We reverse the judgment of the Court of Appeals and remand for proceedings consistent with this opinion.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

After finding that petitioner Ford Motor Company had discriminated unlawfully against Judy Gaddis and Rebecca Starr because of their sex, the Court of Appeals affirmed the District Court's backpay award to the two women "as a proper exercise of discretion founded on not clearly erroneous factual determinations." 645 F. 2d 183, 201 (CA4 1981). The Court today reverses this unremarkable holding with a wide-ranging advisory ruling stretching far beyond the confines of this case. The Court's rule provides employers who

have engaged in unlawful hiring practices with a unilateral device to cut off their backpay liability to the victims of their past discrimination.

To justify its new rule, the Court mischaracterizes the holding of the Court of Appeals, undertakes an intricate economic analysis of hypothetical situations not presented here, and invokes the rights of "'innocent third parties,'" *ante*, at 239, who are not before the Court. By so doing, the Court not only supplants traditional district court discretion to mold equitable relief, but also ensures that Judy Gaddis and Rebecca Starr—the only Title VII claimants whose rights are at issue in this lawsuit—will not be made whole for injury they indisputably have suffered. I find the Court's ruling both unnecessary and unfair. I dissent.

## I

## A

The Court frames the question presented as "whether an employer charged with discrimination in hiring can toll the continuing accrual of backpay liability . . . simply by unconditionally offering the [Title VII] claimant the job previously denied, or whether the employer also must offer seniority retroactive to the date of the alleged discrimination." *Ante*, at 220. In my view, the Court simply and completely misstates the issue. The question before us is not which of two inflexible standards should govern accrual of backpay liability in *all* Title VII cases, but whether the District Court's award of backpay relief to Gaddis and Starr *in this case* constituted an abuse of discretion.

The Court makes frequent and puzzling reference to the "onerous burden[s]" and "sacrifice demanded by the lower court's rule." *Ante*, at 239, 240. See also *ante*, at 227 ("the lower court's rule"); *ante*, at 229 ("[t]he rule adopted by the court below"); *ibid.* ("the Court of Appeals' rule"); *ante*, at 230, n. 12 ("the rule applied by the court below"); *ante*, at 238 ("[t]he rule . . . adopted by the court below"); *ante*, at 241

("the rule adopted by the court below"). In fact, the Court of Appeals adopted no inflexible "rule" at all. Rather, it simply applied the well-settled and flexible principles of appellate review of Title VII remedies prescribed in *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405 (1975), and *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976).

In *Albemarle,* this Court directed that, in most Title VII matters, "the standard of [appellate] review will be the familiar one of whether the District Court was 'clearly erroneous' in its factual findings and whether it 'abused' its traditional discretion to locate 'a just result' in light of the circumstances peculiar to the case," 422 U. S., at 424 (citation omitted). With regard to Title VII backpay relief, however, the Court specified that "'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Id.,* at 418, quoting *Louisiana* v. *United States,* 380 U. S. 145, 154 (1965). To achieve this purpose, "Congress took care to arm the courts with full equitable powers. For it is the historic purpose of equity to 'secur[e] complete justice.'" 422 U. S., at 418 (citation omitted).[1]

---

[1] In passing the Equal Employment Opportunity Act of 1972, 86 Stat. 103, Congress specifically rejected several legislative efforts to limit the judicial power to award backpay. See *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 420 (1975). The Section-by-Section Analysis accompanying the Conference Committee Report reaffirmed the "make whole" purpose of § 706(g), Title VII's backpay provision:

"The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective . . . requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." 118 Cong. Rec. 7168 (1972), quoted in *Albemarle Paper Co.* v. *Moody,* 422 U. S., at 421.

The Court in *Albemarle* and *Franks* made clear that, in Title VII cases, the equitable discretion of district courts should be guided by a heavy presumption in favor of full backpay awards. "Rather than limiting the power of district courts to do equity, the presumption insures that complete equity normally will be accomplished." *Franks* v. *Bowman Transportation Co.*, 424 U. S., at 786 (POWELL, J., concurring in part and dissenting in part). By exercising their discretion to award full backpay relief, district courts further two broad purposes underlying Title VII. First, "the reasonably certain prospect of a backpay award . . . 'provide[s] the spur or catalyst which causes employers . . . to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges'" of discrimination. *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 417–418 (citation omitted). Second, backpay awards "make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.*, at 418.

Thus, the goal of appellate review is to ensure that the district courts have exercised their remedial discretion in the way that "allow[s] the most complete achievement of the objectives of Title VII that is attainable under the facts and circumstances of the specific case." *Franks* v. *Bowman Transportation Co.*, 424 U. S., at 770–771. "The courts of appeals must maintain a consistent and principled application of the backpay provision, consonant with [Title VII's] twin statutory objectives, while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases." *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 421–422.

## B

In this case, the trial court's findings of fact were uncontroverted. In July 1971, Judy Gaddis and Rebecca Starr sought jobs at petitioner Ford's automotive parts warehouse in Charlotte, N. C. "Because of their experience, each was qualified to work at Ford as a 'picker-packer.'" App. to

Pet. for Cert. A–159 (District Court's Findings of Fact). Ford's stated hiring practice was to fill job vacancies at the warehouse by "taking the earliest filed applications first," and selecting employees by interviewing qualified candidates. *Id.*, at A–157. At the time Gaddis and Starr applied, however, Ford had never hired any woman to work at the warehouse.[2] *Id.*, at A–167—A–168. When Gaddis and Starr received their application forms, "a receptionist at Ford . . . told them in substance that Ford did not hire women to work in the warehouse." *Id.*, at A–159.

Despite Gaddis' persistent requests for job interviews, petitioner interviewed neither woman immediately, supposedly because no job vacancy existed. *Id.*, at A–160—A–161. The unit supervisor testified: "Ms. Gaddis called me on several occasions and asked if I was hiring, and I said no, . . . I just have too much work to do to sit down and interview people if I'm not hiring." App. 31. Shortly thereafter, however, in August 1971, Ford hired male applicants to fill four job openings. App. to Pet. for Cert. A–159—A–160. "At least two of the men . . . were offered their jobs *after* Gaddis and Starr applied." *Id.*, at A–160 (emphasis in original).

Gaddis filed a sex discrimination charge with respondent EEOC in September 1971. *Id.*, at A–154. In January 1973, Gaddis and Starr were recalled to jobs at a nearby General Motors warehouse. In July 1973, petitioner made a vague job offer first to Gaddis, then to Starr.[3] The District Court

---

[2] The District Court found, for example, that the job application of Zettie Smith, who sought employment at Ford about a month before Gaddis and Starr, and who was the first woman to apply for a warehouse job there, "was never seriously considered because she is a woman." App. to Pet. for Cert. A–157—A–158.

[3] At trial, Gaddis was asked:

"Q. Did [the clerk to the warehouse manager] say that the job was being offered to you, or did he discuss simply with you, in the form of an interview, the possibility of hiring you into some job?

"A. It was so vague that I couldn't pinpoint anything down. They never did say what type of work it would be, whether it would be [parts]

found as a fact that "[t]he offer to the two women was made after Ford learned that a charge of sex discrimination had been filed with the Commission (and was prompted by a desire to bring some women into the warehouse in response to the charge)." *Id.*, at A–162 — A–163.[4]

Gaddis, and then Starr, turned down petitioner's job offer. The District Court found that the offer was "refused by both women since they were at that time back at work in the General Motors warehouse, having been recalled to work in Janu-

---

picking or whether it would be in sheet metal or whether it would be putting up stock or whether it would be on a day shift or night shift, whether it was a permanent or temporary job. At the time, I had a good seniority with General Motors and I had a secure job, and so on those grounds, I refused it." App. 43.

Similarly, Starr testified on cross-examination:

"I remember [the clerk to the warehouse manager] wasn't specific on the job about what it would be. I did have, at General Motors I had fifteen, I don't know if it was fourteen or fifteen people under me. I had seniority, and I also, this is the truth about [it,] I was scared. Whenever I had worked at Ford before, I had been badgered and I don't know, I was just, I wanted to look into the job. Yet, I had a fear to go back. I didn't know what I would be facing." *Id.*, at 54.

[4] The trial testimony of Ford's warehouse operations manager illuminates petitioner's motives:

"Q. Whose decision was it to call Ms. Gaddis and Ms. Starr?

"A. It was my decision.

"Q. Why?

"A. Well, mainly because we had a suit, EEOC suit filed against us, and we wanted to give one of them an opportunity to go to work for us, and we only had one, maybe two openings at that time.

.      .      .      .      .

"Q. Mr. Ely, you indicated in your testimony that you offered a job to one of the women, either Ms. Gaddis or Ms. Starr, in July, 1973. Is that correct?

"A. Yes, that's correct.

"Q. You also stated that you offered such job because of the EEOC charge which had been filed against Ford Motor Company. Is that correct?

"A. That's correct." *Id.*, at 17–18.

ary, 1973. Neither woman wished to lose accrued seniority at General Motors and neither wanted to be the only woman employed in the Ford warehouse." *Id.*, at A–163.

Based on its factual findings, the District Court concluded as a matter of law that "Ford discriminated against . . . Gaddis and Starr on the basis of their sex by failing to employ them in its warehouse in the positions filled in August, 1971." *Id.*, at A–167. In rulings not contested here, the District Court also found that 10 other women had established prima facie cases of unlawful sex discrimination by Ford. *Id.*, at A–168.

To determine the backpay remedy to which Gaddis and Starr were entitled, the District Court attached no legal significance to the women's decision to decline beginning employment at Ford nearly two years after they unlawfully had been denied those same jobs and six months after they had begun accumulating seniority elsewhere.[5] In the ruling which the Court today implicitly deems an abuse of discretion, the District Court held that "[b]lack pay due to Gaddis and Starr shall not be affected by their refusal to accept the single position offered them in July, 1973, inasmuch as neither would have been confronted by that decision and its implications had both been hired in August, 1971." *Id.*, at A–170—A–171.

Applying the standard of review specified in *Franks, supra,* and *Albemarle, supra,* the Court of Appeals, 645 F. 2d,

---

[5] The District Court applied two equitable principles to shape relief in this case. It first concluded that an award of all backpay accruing after August 1971 would make Gaddis and Starr whole. The District Court therefore reconstructed a probable employment history at Ford for each woman, calculating what each would have received but for petitioner's unlawful discrimination. Second, the court obliged Gaddis and Starr to take all reasonable steps to mitigate damages. Accordingly, it subtracted from the backpay awards any amounts Gaddis and Starr actually earned or reasonably could have earned after August 1971. App. to Pet. for Cert. A–170.

at 200, affirmed "the district court's decision as a proper exercise of discretion founded on not clearly erroneous factual determinations." *Id.*, at 201. In particular, the Court of Appeals found no abuse of discretion in the District Court's failure to terminate the backpay awards in July 1973.[6]

The Court of Appeals rested its narrow ruling on two key facts: that "Gaddis and Starr could accept [Ford's] offer only by *forfeiting the seniority* they had accumulated at General Motors and *without a compensating offer of seniority at Ford* to alleviate the effects of the discrimination against them in 1971." *Id.*, at 192. (Emphasis added.) The court expressed no view as to whether Ford's backpay liability would have been tolled if Gaddis and Starr could have accepted Ford's job offer without forfeiting seniority accumulated elsewhere. Nor did the Court of Appeals decide whether the women would have been obliged to accept Ford's offer had it encompassed *some* compensating offer of seniority, short of full retroactive seniority.

Contrary to this Court's suggestion today, the Court of Appeals announced no general *rule* that an employer's "backpay liability should be tolled *only* by the rejection of an offer that includes seniority retroactive to the date on which the alleged discrimination occurred." *Ante*, at 228 (emphasis added). The Court of Appeals merely refused to announce a broad new rule, urged by Ford, requiring victims of Title VII discrimination to "accept job offers which include a loss of seniority in order to preserve their back pay rights." 645 F. 2d, at 192. Such an inflexible approach, the court decided, would frustrate Title VII's central purposes by permit-

---

[6] "[T]he district court reached an eminently reasonable result. It did not permit Ford to cut off the back pay period by making Gaddis and Starr an incomplete and unacceptable offer, and it denied Gaddis and Starr a double recovery by deducting their General Motors wages from their back pay awards." 645 F. 2d, at 193.

ting employers to present discriminatees with an "intolerable choice."[7]  *Ibid.*

## II

The Court today accepts Ford's invitation, wisely declined by the Court of Appeals, and adopts its broad new rule governing awards of backpay relief in Title VII cases: henceforth, "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability."[8]  *Ante,* at 241.  This ruling is disturbing in four respects.

First: The Court's new rule is flatly inconsistent with *Albemarle*'s unambiguous directive "that, given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  422 U. S., at 421.  Applied generally, the Court's rule interferes with both objectives.

The Court's approach authorizes employers to make "cheap offers" to the victims of their past discrimination.  Employ-

---

[7] "[I]f Gaddis and Starr rejected Ford's offer and stayed at General Motors, they would forego their rights to further back pay benefits.  On the other hand, if they accepted the job offered by Ford, which they had not held for the previous two years because of Ford's discriminatory hiring policy, they would lose their seniority rights at General Motors."  *Id.,* at 192.

[8] The Court's explanation for its misreading of the Court of Appeals' decision is that the United States District Court for the Western District of Virginia has interpreted that decision as stating a somewhat different proposition.  See *ante,* at 227, n. 10.  But if one District Court in the Fourth Circuit has misconstrued the Fourth Circuit's opinion, surely that is a matter properly to be corrected by the United States Court of Appeals for the Fourth Circuit.  This Court is not entitled to transform a narrow Court of Appeals ruling into a broad one, just so that it may reverse and install a broad new rule of its own choosing.

ers may now terminate their backpay liability unilaterally by extending to their discrimination victims offers they cannot reasonably accept. Once an employer has refused to hire a job applicant, and that applicant has mitigated damages by obtaining and accumulating seniority in another job, the employer may offer the applicant the same job that she was denied unlawfully several years earlier. In this very case, for example, Ford offered Gaddis and Starr jobs only after they had obtained employment elsewhere and only because they had filed charges with the EEOC. If, as here, the applicant declines the offer to preserve existing job security, the employer has successfully cut off all future backpay liability to that applicant. By insulating a discriminating employer from proper liability for his discriminatory acts, the Court's rule reduces his "incentive to shun practices of dubious legality," *id.*, at 417, and hinders the eradication of discrimination.

The Court's rule also violates Title VII's second objective—making victims of discrimination whole. Again, the rule's anomalies are well illustrated by the facts of this case. Had petitioner not discriminated against Gaddis and Starr, both would have begun to work at Ford in August 1971. By July 1973, both would have accumulated nearly two years of seniority. Because of Ford's discrimination, however, each experienced long periods of unemployment and temporary employment before obtaining jobs elsewhere.[9] The District Court therefore determined that only full backpay awards, mitigated by wages earned or reasonably earnable elsewhere, would make Gaddis and Starr whole.

This Court now truncates those awards simply because Gaddis and Starr refused to accept Ford's offers of beginning employment in 1973. Yet even if Gaddis and Starr had ac-

---

[9] Gaddis, for example, sought employment in South Carolina "at various parts places, independent part places, car dealers, such as Chrysler-Plymouth, the Ford place which was Lewis Ford at that time, all the car dealers, . . . some of the hosiery mills, . . . [and] Radiator Specialty Company," 3 Tr. 362, before obtaining her job at General Motors.

cepted those offers, they would not have been made whole. Deprived of two years of seniority, Gaddis and Starr would have enjoyed lesser health, life, and unemployment insurance benefits, lower wages, less eligibility for promotion and transfer, and greater vulnerability to layoffs than persons hired after they were unlawfully refused employment. See Tr. of Oral Arg. 30; Brief for Respondent 17. Even if Gaddis and Starr had continued to litigate the question of their retroactive seniority after accepting Ford's offer, they still would have spent many years at Ford "subordinate to persons who, but for the illegal discrimination, would have been[,] in respect to entitlement to [competitive seniority] benefits[,] [their] inferiors." *Franks* v. *Bowman Transportation Co.*, 424 U. S., at 768.

The Court claims that its new rule "powerfully motivates employers to put Title VII claimants to work, thus ending ongoing discrimination as promptly as possible." *Ante*, at 230. In fact, the discrimination is not ended, because a discrimination victim who accepts a "cheap offer" will be obliged to work at a seniority disadvantage, and therefore will suffer ongoing effects from the employer's discriminatory act. The Court also alleges that its rule promotes "cooperation and voluntary compliance" with Title VII by giving both employers and claimants incentives to make and accept "unconditional" job offers. *Ante*, at 228–229. If the Court's rule furthers this end, however, it does so only by weakening the bargaining position of a claimant vis-à-vis the employer. Discrimination victims will be forced to accept otherwise unacceptable offers, because they will know that rejection of those offers truncates their backpay recovery. A rule that shields discriminating employers from liability for their past discrimination and coerces bona fide Title VII claimants to accept incomplete job offers is fundamentally incompatible with the purposes of Title VII.

Second: The Court's rule unjustifiably limits a district court's discretion to make individual discrimination victims

whole through awards of backpay. The Court suggests that, "absent special circumstances," a district court abuses its discretion *per se* if it fails to terminate an employer's backpay liability at the point where that employer has extended an unconditional job offer to a discrimination claimant. Yet "[i]n *Albemarle Paper* the Court read Title VII as creating a *presumption in favor* of backpay." *Franks* v. *Bowman Transportation Co.*, 424 U. S., at 786 (POWELL, J., concurring in part and dissenting in part) (emphasis added).[10] *Franks* supplied "emphatic confirmation that federal courts are empowered to fashion such relief as the *particular circumstances of a case may require* to effect restitution, making whole insofar as possible the victims of . . . discrimination in hiring." *Id.*, at 764 (opinion of the Court) (emphasis added).

The Court recognizes that its new rule interferes with district court discretion to make complete backpay awards in individual cases. Thus, the Court expressly preserves the principle of appellate deference to the "sound discretion" of the trial court in "exceptional circumstances." *Ante*, at 238–239, n. 27. Yet, curiously, the Court offers no explanation why the facts of this very case fail to satisfy its own "exceptional circumstances" test.[11] Given the Court's conces-

---

[10] The Court cites language from *Albemarle* suggesting that a district court's discretion is not limitless. See *ante*, at 226–227. But the Court conspicuously omits *Albemarle*'s clear statement that if Congress intended to limit the equitable discretion of district courts in any way, it did so only by leaving "'little room for the exercise of discretion *not* to order reimbursement.'" See *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 417, quoting *Mitchell* v. *DeMario Jewelry, Inc.*, 361 U. S. 288, 296 (1960) (emphasis added).

[11] The Court suggests, for example, that if a hypothetical Title VII "claimant has been forced to move a great distance to find a replacement job, a rejection of the employer's offer might reflect the costs of relocation more than a judgment that the replacement job was superior, all things considered, to the defendant's job." *Ante*, at 238, n. 27. For Gaddis and Starr, however, the loss of their accumulated seniority at their replace-

sion that district courts must retain their discretion to make bona fide Title VII claimants whole in some cases, I see no advantage in prescribing a blanket rule that displaces that discretion in other cases where complete relief is equally justified.

Third: I am disturbed by the Court's efforts to justify its rule by relying on situations not presented by this case. For example, the Court partially rests its rule on an "unemployed or underemployed claimant's statutory obligation to minimize damages" by accepting an unconditional job offer without seniority. *Ante*, at 234. Because Gaddis and Starr were fully employed when Ford finally offered them jobs, however, neither the District Court nor the Court of Appeals exempted unemployed or underemployed victims of discrimination from accepting offers like Ford's.[12] Similarly, the Court analyzes the hypothetical case of a Title VII claimant who "has had the good fortune to find a more attractive job than the defendant's." *Ibid.* But, as the Court later recognizes, there is no assurance that the present case fits this category either. After speculating at length about how Gaddis and Starr may have valued the relative worth of their Ford and General Motors jobs, see *ante*, at 234–236, the Court finally acknowledges that on this paper record, "[w]e cannot infer" how much Gaddis and Starr "valued their GM jobs . . . solely from their rejection of Ford's offer." *Ante*, at 235, n. 24.

---

ment jobs certainly reflected "costs of relocation" at least as substantial as high moving expenses.

I expect that federal courts will find no meaningful distinction between a worker's refusal to accept a job offer because he believes that acceptance would force him to incur costs, and a similar refusal based on the worker's judgment that changing jobs would prove costly. In either case, for purposes of awarding Title VII relief, the reasonableness of the worker's refusal should be left to the trial court's discretion.

[12] The purpose of § 706(g)'s "mitigation of damages" requirement is to encourage claimants to work while their Title VII claims are being adjudicated. The Court cannot deny that Gaddis and Starr fully mitigated damages by seeking and obtaining other employment while litigating their claims against Ford.

Equally unconvincing is the Court's repeated invocation of, and preoccupation with, "the rights of 'innocent third parties,'" *ante*, at 239, and the "disruption of the existing seniority system[s]," *ante*, at 229, that would result from adoption of the Court of Appeals' "rule." The Court nowhere demonstrates how *petitioner's* labor relations would have suffered had it extended offers of retroactive seniority to Gaddis and Starr. The details of Ford's collective-bargaining agreement were not litigated in either the District Court or the Court of Appeals. See Tr. of Oral Arg. 30–31. Thus, those courts never passed on petitioner's obligation to offer retroactive seniority to Gaddis and Starr if such an offer would have disrupted its labor relations or existing seniority systems.[13] Nor did the Court of Appeals decide, as a general matter, whether or not offers of retroactive seniority to discrimination claimants adversely affect the rights of incumbent employees.[14] The Court cannot justify reversal in the

---

[13] The Court of Appeals did not foreclose the possibility that Ford could have terminated its backpay liability to Gaddis and Starr by offering them employment plus an award of *provisional* seniority, defeasible in the event that they lost their continuing lawsuit for backpay. Nor did the Court of Appeals deny that offering a job without seniority might terminate Ford's backpay liability, should any provision of Ford's collective-bargaining agreement preclude it from making offers of retroactive seniority. Had petitioner pointed to such a collective-bargaining agreement provision, or proved that its incumbent employees actually had objected to offers of retroactive seniority to Title VII claimants, the Court of Appeals would have considered those factors in determining whether the District Court abused its discretion in shaping Gaddis' and Starr's relief.

[14] In any event, the Court's claim that offers of retroactive seniority would injure the rights of incumbent employees is vastly overstated. If an employer sued by a Title VII claimant could toll the accrual of backpay liability by making a unilateral offer that included some form of retroactive seniority, he still would have every incentive to make such an offer as soon as possible after the discriminatory act. The amount of retroactive seniority offered would necessarily be small, and the seniority rights of relatively few incumbent employees would be affected.

Under the Court's approach, in contrast, employers will no longer have any incentive to offer retroactive seniority. Any awards of retroactive se-

case at hand by vague reference to classes of claimants and third parties who are not before the Court. To the extent that it seeks to do so, its intricate argument is both irrelevant and advisory.

Fourth and finally: I am struck by the contrast between the Court's concern for parties who are not here and its studied indifference to the real-life concerns of the parties whose interests are directly affected. When the Court finally confronts the choice that actually faced Gaddis and Starr, *ante,* at 236–239, it blithely suggests that "[a]fter all, they had the option of accepting Ford's unconditional offer and retaining the right to seek full compensation at trial" in the form of retroactive seniority. *Ante,* at 237. Yet the Court earlier acknowledges that "[d]elays in litigation unfortunately are now commonplace, forcing the victims of discrimination to suffer years of underemployment or unemployment before they can obtain a court order awarding them the jobs unlawfully denied them." *Ante,* at 228.

"If the choice presented to Gaddis and Starr was difficult," the Court continues, "it was only because it required them to assess their likelihood of prevailing at trial." *Ante,* at 238. Without consulting the record, the Court then states:

> "Gaddis and Starr presumably rejected Ford's offer because they thought their jobs at GM were worth more to them than full compensation (Ford's offer plus a court award) discounted by the risks of litigation. . . . Had they known they were going to win [their lawsuit], of course, they would have rejected the Ford job only if they valued the GM jobs more than they valued the combination of Ford's job plus the value of court-ordered

niority to bona fide Title VII claimants will thus be court-ordered, and will be entered only after "the lengthy delays that too often attend Title VII litigation." *Ante,* at 221. By delaying awards of retroactive seniority until final judgment in a significant number of cases, the Court's approach ensures that the seniority rights of comparatively greater numbers of incumbent employees will be affected adversely.

compensation *un*discounted by the risks of litigation."
*Ante,* at 237, n. 26 (emphasis in original).

This is a comfortable rationale stated from the sidelines. Unfortunately, the abstract and technical concerns that govern the Court's calculations bear little resemblance to those that actually motivated Judy Gaddis and Rebecca Starr. When asked on cross-examination why she had turned down Ford's 1973 offer, Gaddis testified: "I had seniority [at General Motors] and I knew that I wasn't in danger of any layoff, where if I had accepted the job at Ford *I might have worked a week or two weeks and been laid off because I would have been low seniority.*" App. 47 (emphasis added). Similarly, Starr testified on cross-examination: "I had seniority at General Motors. I had about fifteen people working under me. *I could go to work at Ford and work a week and I knew that they could lay me off.*" 4 Tr. 365–366 (emphasis added).

To a person living in the real world, the value of job security today far outstrips the value of full court-ordered compensation many years in the future. The Court's elaborate speculation about the concerns that "presumably" motivated Gaddis and Starr nowhere recognizes what a Ford job without seniority actually meant to Gaddis and Starr—a job from which they could be laid off at any moment. Unlike the Court, Gaddis and Starr recognized that if they traded their jobs with seniority for jobs without seniority, they could quickly become unemployed again, long before they had the chance to vindicate their rights at trial.

To people like Gaddis and Starr, the knowledge that they might someday establish their Title VII claims on the merits provides little solace for their immediate and pressing personal needs. Starr's trial testimony reveals just how much job security meant to her:

"It was just a couple of days after I had [started working] there [at a temporary job] and this is, I was just wanting that job so bad because you can't, a woman,

when you've got three children, I needed the money, and I was wanting the job so bad. I worked so hard. I'll never forget one day when [the unit supervisor] came to me. I'll never forget that, and he said, I had just been there a few days, I'll have to let you go. . . . It broke my heart because I knew I had worked so hard." *Id.*, at 356.[15]

I agree with the Court that "the victims of job discrimination want jobs, not lawsuits." *Ante*, at 230. See also, *ante*, at 221 ("The claimant needs work that will feed a family and restore self-respect. A job is needed—now"). When Ford made its 1973 offers to Gaddis and Starr, however, they *had* jobs, in which they had accumulated seniority despite Ford's discrimination. I therefore cannot accept the Court's conclusion that these women should have traded those jobs for uncertain employment in which back seniority could be won only by lawsuit. Nor can I justify penalizing Gaddis and Starr because they "discounted" the ultimate likelihood of obtaining court-ordered retroactive seniority at a different rate than the Court does today.

After hearing all the witnesses and appraising all the evidence, the District Court exercised its equitable discretion to shape complete backpay relief for Gaddis and Starr. In light of all the circumstances, the District Court refused to penalize Gaddis and Starr for declining Ford's 1973 job offer. Applying the correct standard of review over Title VII reme-

---

[15] Without embarrassment, the Court cites Rebecca Starr's testimony to support its argument that the Court of Appeals' "rule," and not its own new rule, is indifferent to the real-life concerns of victims of sex discrimination. See *ante*, at 230, n. 12. Under the Court of Appeals' "rule," however, Rebecca Starr was awarded full backpay as compensation for Ford's sex discrimination. Under this Court's rule, a large portion of Starr's compensation will simply be cut off. By claiming that the Court of Appeals was somehow *more* indifferent to Starr's real-life concerns, the Court only confirms how far removed from the real world it is.

dies, the Court of Appeals concluded that the District Court had exercised its remedial discretion properly. Sitting at this remove, I cannot say that Gaddis and Starr acted unreasonably. I would affirm the judgment of the Court of Appeals and thereby, for these two victims of discrimination, fulfill, and not defeat, the promise of Title VII.