**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**Avis M. Cook, Plaintiff-Intervenor,**

**v.**

**EXXON CORPORATION D/B/A Exxon Company, U.S.A., Defendant.**

**Civ. A. No. H–81–1047.**

United States District Court,
S.D. Texas,
Houston Division.

Feb. 9, 1984.

John H. Whaley, E.E.O.C., Houston District Office, Houston, Tex., for plaintiff.

Gordon R. Cooper, II, Houston, Tex., for plaintiff-intervenor.

Melinda Furche Harmon, Jim L. Garcia, Houston, Tex., for defendant.

## FINDING OF FACT AND CONCLUSIONS OF LAW

SINGLETON, Chief Judge.

The plaintiff Equal Employment Opportunity Commission ("EEOC") instituted this suit, against defendant Exxon Corporation ("Exxon") claiming that Exxon discriminated against Avis M. Cook on the basis of sex in violation of 42 U.S.C. § 2000e et seq. ("Title VII"). Mrs. Cook intervened ("Intervenor") on her own behalf. This court finds that Exxon intentionally discriminated against Intervenor Avis Cook when it denied her a promotion to Transportation Allocator Agency on June 1, 1979.

## STIPULATED FACTS

The parties stipulate to the following facts:

Plaintiff EEOC is an agency of the government of the United States.

Since at least July 2, 1965, the defendant has been doing business in the State of Texas, where it is engaged in the production and refinement of oil that moves in interstate commerce and has continuously employed and does now employ more than fifteen (15) employees.

Since at least July 2, 1965, the defendant had continuously been and is now an em-

ployer engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. Section 2000e(b), (g) and (h).

Avis M. Cook was hired in 1951 by Humble Oil and Refining Company, a predecessor of defendant, as a clerk/stenographer in the warehouse department of the Baytown refinery. Avis M. Cook voluntarily terminated her employment with the Defendant in 1954. Avis M. Cook was rehired by the defendant as a clerk/stenographer at its Baytown facility in the marine department in 1964. Intervenor was employed by defendant for more than fifteen years.

At all times material and relevant to this lawsuit, the marine department of the defendant did not have a written promotion policy.

Mr. Billy Hopper was hired on March 1, 1979 as an Agency Transportation Allocator ("T.A."). Since July 31, 1976, Mr. Hopper had performed the duties of an Agency T.A. on a part-time contract basis.

Mr. Ignacio Hurtado was given a lateral transfer on June 1, 1979, to the position of Agency T.A. at the Baytown facility. Prior to Mr. Hurtado's transfer, he had been assigned to the Headquarter's Fleet Manning Office in Houston.

Avis M. Cook filed Charge No. 064–79–1619 against defendant on June 21, 1979. On October 23, 1980, the Commission sent the defendant a letter stating that the Commission's conciliation efforts had failed. Defendant received the letter on October 24, 1980.

## FINDINGS OF FACT

Intervenor Avis M. Cook is an adult female citizen of the United States and a resident of Texas. In December 1970, Exxon reclassified Mrs. Cook's position as a steno/clerk to a secretary.

The marine department of the Gulf Coast Branch located at Baytown office was primarily a field support office responsible for Exxon's marine activities within the confines of the State of Texas. The office coordinated support activities to Exxon's affiliate owned and operated vessels making port calls within Texas. The office also dispatched two local towboats and associated barges in a floating "filling station" manner to customer vessels at the ports of Houston, Galveston, Texas City, and on occasion to Port Arthur, Beaumont and Freeport.

The office was also responsible for overall coordination of Exxon's West Gulf lightering operation including the dispatch, coordination of services, and general stewardship of this operation which was comprised of the dedicated use of two Panamanian flag 70,000 ton vessels for complete offloading of Exxon's V/ULCC's anchored in the Gulf.

At the Gulf Coast Branch, Exxon employed Agency Transportation Allocators, and Inland Transportation Allocators ("T.A.s").

All Agency T.A.s were expected to coordinate the needs of vessels assigned to them. Basically, each T.A. was assigned to husband an approximately equal number of vessels as they arrived and to insure that all support activities necessary for a safe, efficient turnaround were carried out with an absolute minimum of frustration to the vessel's personnel or operators. These activities include arranging for tugs, pilots, and line-handlers for the channel transits and mooring and unmooring of vessels at predetermined berths within ports within Texas. They also included ordering and coordinating delivery of goods and services as required by the vessel's personnel and operators. These consisted of, but were not limited to, fuel, water, provisions and stores, relief personnel, mail delivery and other equipment services. For vessels engaged in foreign trade or service, T.A.s were also required to prepare government documents, and to file these documents with the appropriate government agency, such as customs for entrance/clearance for the vessel; immigration for crew-related matters; and agriculture for provisions and stores. For all vessels, the assigned T.A. followed the progress of each vessel, not-

ing deficiencies, coping with emergencies, and correcting misunderstandings, etc. to expedite the vessel's in-port time, to keep this time to an absolute minimum. These duties took up approximately 80% of each T.A.'s time.

In addition to the above general duties, each agency T.A. was also assigned an additional area of responsibility unique to each position. The specialty comprised approximately 20% of each T.A.'s time.

One T.A. was responsible for coordinating the crewing of two locally dispatched towboats. This represented eight personnel. This T.A. was also responsible for interviewing and hiring for these positions, when needed, and for interviewing prospective candidates, when needed, for the ocean fleet. In previous years this T.A. had performed substantial personnel-related duties, such as routine interviewing for the ocean fleet, assisting fleet personnel with benefit transactions, and the like, but many of these duties had been taken over by other offices within Exxon by late 1978. W.A. Scott performed these position-unique duties while he was in the Baytown office.

All agency T.A.s assigned to Baytown covered after hours and weekend responsibilities for the entire Agency office on a weekly rotating basis.

In addition to Agency, three T.A.s were assigned to the Inland office which was responsible for coordinating the delivery of Exxon's marine fuel sales in the ports of Houston, Galveston, Texas City, Beaumont, Port Arthur and Freeport. These T.A.s receive sales orders from New York and confirmed with local ship agents for deliveries to customer ships. These T.A.s issued loading and discharge orders to terminals and to Exxon's tows and insured that deliveries were properly made to the vessels. The Inland T.A.s also were responsible for passing billing information back to New York on delivered quantities.

Approximately 80% of the Agency T.A.'s time was spent working in the office. The Agency T.A. was required to board ships from time to time. An Inland T.A. position almost exclusively involved paper work in the office, and never required any boarding of ships.

The Agency T.A. and Inland T.A. were only comparable jobs in the sense that they both carried a salary level of 22–24. Each job, however, required different duties and different skills to perform those duties. The Agency T.A. serviced ocean going vessels. Testimony established that good interpersonal skills constituted a minimum requirement. The Agency T.A. had to make judgment calls and was required to board vessels. The Agency T.A. had to deal with several governmental bodies, such as Immigration and Naturalization, the Coast Guard, and the Department of Justice, all of which required filling out numerous government forms. In contrast, the Inland T.A. served as a coordinator between customer, supplier, and transporter. This job was a desk job and did not require boarding vessels or dealing with certain governmental agencies. The documentation requirements of each position were different.

Initially, Mrs. Cook's duties were restricted to typing, filing and dictation. Gradually, she began helping the Agency T.A.s perform their duties. Beginning in approximately 1969, Mrs. Cook would relieve Agency T.A.s when one was on vacation. From 1969–1974, Mrs. Cook relieved Mr. Arthur Irwin, and during 1973–1976, Mrs. Cook relieved Mr. W.A. Scott while they were on vacation. In addition, Mrs. Cook performed some of Mr. Scott's duties on a daily basis when he was not on vacation. Some of the T.A. duties Mrs. Cook assumed included preparation of the daily steamer slate, cargo documentation, handling of the imprest fund, telephone calls to contact pilots, tugs, and store-vendors, taking mail to ships, and preparation of vessel documentation. At one time or another, Mrs. Cook performed every duty of an Agency T.A., including the boarding of ships, although she did not assume the T.A.s' cover duty on nights or weekends. Mrs. Cook did only a minimum amount of work for the Inland section.

Exxon has a policy of promoting from within the ranks of the company before hiring someone from outside, whenever feasible. In 1978, intervenor was evaluated as qualified for a promotion to a level 22 T.A. In late November 1978, Mr. Craig Rassinier, Operations Manager of the Baytown facility, discussed with Mrs. Cook her desire for a T.A. position. Mrs. Cook stated that she was interested in an Agency position, and Mr. Rassinier informed her that he was expecting two openings in Agency. Mr. Rassinier expressed his concern for her safety because, as an Agency T.A., Mrs. Cook would be required to board vessels at night, on weekends, and out-of-town. He asked Mrs. Cook to discuss these responsibilities with her husband and stated that he would get back to her. Mrs. Cook, after approximately two weeks, approached Mr. Rassinier about the Agency position, but he relayed a message to her that "there are some people in Houston who don't know about having a woman" as an Agency T.A. Mrs. Cook was never offered either Agency position that became vacant. From November 1978 through June 1979, Mrs. Cook was paid secretary wages at level 14.

In late 1978, Exxon's management determined that the marine department needed restructuring. The plan was to reduce the number of T.A.s in Inland from three to two, transferring one into Agency. In addition, management wanted to merge the Agency section with the VLCC section to reduce weekend rotations from once every two weeks to once every five weeks. To implement its plan, in December 1978 management transferred Mr. Thomas Brown from Inland to Agency. Mr. Brown, however, never assumed the Agency T.A.'s duties, instead he retired in March 1979. Also in December, 1978, Mr. W.A. Scott, an Agency T.A., went on extended sick leave. At that time, management realized his condition was serious, and although hopeful, was aware that Mr. Scott would probably not be able to resume his Agency T.A. duties. Mr. Phillip Stringer left the Inland T.A.'s position in late 1978. Mr. Billy Hopper was hired on a contract basis to fill Mr.

Brown's spot in Agency, but was assigned to perform Mr. Scott's duties.

As part of management plan to restructure the marine department, the Inland T.A. position was changed. One T.A. was to assume a Monday through Friday schedule, in a lead position, while the other was to work Thursday through Monday, as a back-up position. In December 1978, Mr. Rassinier again discussed the possibility of a promotion with Mrs. Cook. Although Mr. Scott was gone on extended sick leave and Mr. Brown's position still was not permanently filled, Mr. Rassinier only informed her that Mr. Stringer left, thus creating a vacancy in Inland. But, then Mr. Rassinier explained to her that, because of the new change in the scheduling, if she accepted the job, she would be required to work the back-up position which entailed working every weekend. Mrs. Cook indicated that she was not interested in a job that required working every weekend. Mr. Rassinier never told her that the weekend duty was only temporary, or that eventually she could be promoted to the lead position.

On March 1, 1979, Mr. Frank Silvia was transferred from marketing to fill the back-up position in Inland. Prior to taking the promotion, Mr. Silvia was informed that weekend duty was only temporary. At the same time, Mr. Hopper was hired in Agency permanently to replace Mr. Brown, who had retired. Mr. Scott informed Exxon that, because of the severity of his arthritic condition, he could no longer board vessels. On May 7, 1979, Mr. Scott was laterally transferred to Senior Manning Assistant in Houston. On May 18, 1979, Mr. Mark Brentzel resigned from the Inland section.

On May 25, 1979, Mr. D.C. Lunceford, Manager of the Gulf Coast Branch, came from Baton Rouge to Baytown to discuss the recent personnel moves with Mrs. Cook. At that time, Mr. Lunceford offered Mrs. Cook the back-up Inland position, stating that Mr. Silvia would be promoted to the lead position. Mrs. Cook said she was not interested in the job if it required that she work every weekend. Mr. Lunceford

asked her to think it over for a few days before making a final decision. On May 31, 1979, Mrs. Cook informed Mr. Rassinier that she was not interested in the job. On June 1, 1979, Mr. Ignacio Hurtado was switched from the Houston office to an Agency T.A. position at the Baytown refinery. Mr. Hurtado's transfer was supposed to replace Mr. Scott, however, he performed Mr. Brown's duties because Mr. Hopper was already performing Mr. Scott's job. On June 21, 1979, Mrs. Cook filed her charge with the EEOC, alleging sex discrimination against Exxon.

Except for the transfer of Mr. Hurtado to Mr. Scott's position, Mr. Rassinier initially screened all promotions, and made a recommendation to Mr. Lunceford, who then made a recommendation to Mr. Ernest McNeil, the Administrative Manager of Exxon Shipping Company.

The testimony established that Exxon's management considered Mrs. Cook's potential for promotion several times. Mrs. Cook and Mr. Rassinier spoke in late 1978 about two agency positions that were expected to open up. Mr. Rassinier's testimony established that only one position eventually became available, and management decided to put Mr. Brown in that spot. However, Mr. Brown never accepted the transfer from Inland to Agency, instead he retired in March. But, that Agency position remained vacant from December 1978, when Mr. Brown was officially transferred, until June 1, 1979 when Mr. Hurtado was transferred from Houston. Mr. Hopper was hired on a contract basis during late 1978 through March 1979, and was performing Mr. Scott's duties, who had gone on extended sick leave. When Mr. Hopper was hired permanently in March, he continued to do Mr. Scott's duties, although the company stated that he was hired to fill Mr. Brown's position. The company explained that Mrs. Cook was not promoted instead of Mr. Hopper, who was hired from outside, because Mr. Hopper was more qualified. Although the company has a policy of promoting from within, the company believed that Mr. Hopper would perform better than Mrs. Cook. The Company

also explained that Mrs. Cook could not be promoted to fill Mr. Brown's vacancy, and at the same time have Mr. Hopper hired to fill Mr. Scott's job, because Mr. Scott was on sick leave and it was not until later that Exxon knew that he would not be able to return to his position. Because Exxon believed Mr. Hopper was better qualified, he was hired instead of promoting Mrs. Cook.

Mrs. Cook was considered for an Inland position in December. Yet, the evidence clearly established that the full details of the new scheduling, or the potential to be promoted to lead position were never explained to her, as they later were to Mr. Silvia. Instead, it was emphasized to Mrs. Cook that she would have to work every weekend. Mrs. Cook was not interested in that position because of the onerous weekend requirement. In addition, she could not understand, nor was it adequately explained to her, why the weekend rotation system was changed. In March, Mr. Silvia was hired for that Inland position. The testimony established that in the discussions with Mr. Silvia for his promotion, he was promised that the weekend duty would be temporary, until the lead position opened up, and that he would be promoted to that position.

At sometime after March 1, 1979, Mr. Scott informed Exxon that he could no longer board vessels. The Company policy favored transferring Mr. Scott to another position within Exxon that would accommodate his medical problem. Testimony established that Mrs. Cook was never considered to fill the vacancy created by Mr. Scott's transfer. On May 7, 1979 top management, without the advice of Mr. Rassinier, decided that the best accommodation for Mr. Scott would be a transfer to Houston. Yet only eleven days later, on May 18, 1978, Mr. Brentzel resigned from Inland. The testimony established that Mr. Scott could have performed the Inland T.A.'s duties because it did not require any boarding of vessels. Instead of transferring Mr. Scott to Inland, and promoting Mrs. Cook to an Agency T.A. position, Exxon management again offered Mrs. Cook the Inland

T.A. position, under the same terms and condition as previously offered, *i.e.* back-up position with weekend duty. Mr. Silvia was promoted to the lead position after less than three months in the department in which Mrs. Cook spent more than fifteen years. Mrs. Cook again rejected this offer.

On June 1, 1979, Exxon transferred Mr. Hurtado from Houston to fill the vacancy created by Mr. Scott. This transfer was contrived at top management levels without consulting Mr. Rassinier. Mr. Hurtado had absolutely no experience in the marine department, either for Inland or Agency. The performance evaluations of Mr. Hurtado , evidenced that he lacked one of the basic minimum requirements for the Agency job: interpersonal skills. After being an Agency T.A. for one year, the performance evaluations indicated he was still learning. Testimony at trial also established that Mr. Hurtado could have been trained for either Inland or Agency because he was without any background for either position. Furthermore, evidence established, without a doubt, that Mrs. Cook was eminently more qualified for the Agency T.A. position than was Mr. Hurtado.

On or about July 1, 1982, the defendant formed a new corporation, Exxon Shipping Company, to which it assigned the work of the marine department of Exxon Company, U.S.A. The marine department was abolished. In addition, some time after June 1979, the Inland position was eliminated in the marine department/Exxon Shipping Company.

### CONCLUSIONS OF LAW

Plaintiff and Intervenor bring this action pursuant to 28 U.S.C. § 451, 1343, and 1345; 42 U.S.C. § 2000e *et seq.* ("Title VII"), claiming that defendant discriminated against Mrs. Cook on the basis of sex when Exxon denied her a promotion to an Agency T.A. position. Exxon denies it discriminated against Mrs. Cook because of her sex. This court has jurisdiction over the claims pursuant to 28 U.S.C. § 1331.

■ To establish a prima facie case of disparate treatment in violation of Title VII, the plaintiff and intervenor must prove by a preponderance of the evidence that:

1. Mrs. Cook belongs to a protected class;

2. she applied for a job for which the employer was seeking applications;

3. despite her qualifications, she was rejected; and

4. after her rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If defendant carries the burden, plaintiff and intervenor must then challenge the reasons given, and prove that it is merely a pretext for sexual discrimination. *Id.* at 804, 93 S.Ct. at 1825. The plaintiff and intervenor bear the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against Mrs. Cook. *Board of Trustees v. Sweeney,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978). Plaintiff and intervenor may succeed if they persuade the court either that the employer was more likely motivated by the discriminatory reason or that the employer's proffered explanation is unworthy of credence. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ Plaintiff and intervenor have successfully carried their burden. The EEOC and Mrs. Cook established a prima facie case and rebutted defendant's proffered reasons by showing that it was merely a pretext for discrimination. The evidence established that at least one Agency position was available from December 1978 through March 1979, and then again from May 1979 through June 1, 1979. Mrs. Cook made management aware of her in-

terest in an Agency position between November 1978 and May 1979. Intervenor was considered for the first vacancy, although management says not the second because it was a lateral transfer of two employees to accommodate Mr. Scott's health problems. Yet, the evidence also established that management determined Mrs. Cook qualified for promotion to a T.A. position. In spite of Mrs. Cook's qualifications, she was not offered either Agency position. As to the first position, Mr. Rassinier informed Mrs. Cook that "there were people in Houston", an obvious reference to Exxon top management, "who did not know" about having a woman as an Agency T.A. Top management did not consult Mr. Rassinier on the second vacancy, but effectuated this lateral transfer, putting a person not qualified for the position in Mr. Scott's place. Management's explanation that this move was the best Exxon could do is unacceptable to this court.

Management had several options which could have easily been implemented to promote Mrs. Cook and still fulfill its plans to expand the Agency section, trim down the Inland section, and accommodate Mr. Scott. The most simple solution would have been to put Mrs. Cook in Mr. Scott's position, give Mr. Scott the lead position in Inland created by Mr. Brentzel's resignation, and hire a new secretary. Another possibility would have been to transfer Mr. Scott to Houston, promote Mrs. Cook to his position, and put Mr. Hurtado in the back-up Inland position. Also, Exxon could have hired Mr. Hopper to fill Mr. Brown's position in December of 1978, or as late as March 1979 when it was clear that Mr. Brown would not accept the transfer, and promote Mrs. Cook to Mr. Scott's position because it was obvious to management at that time that Mr. Scott's condition would prevent him from resuming the full extent of his Agency duties. Surely, there are many other options beyond this court's grasp that a company as large as Exxon could have adopted instead of transferring Mr. Hurtado, who was not qualified at all, and certainly less qualified than Avis Cook, to fill Mr. Scott's position. This lateral transfer is conclusive evidence of Exxon's intent to discriminate against Mrs. Cook and keep her out of the Agency position, which required boarding vessels at nights and on weekends.

Instead of offering Mrs. Cook the job she desired in the area with which she was familiar, Exxon offered her the Inland position. Initially, the court draws attention to one of the marked differences between Agency and Inland, the Inland position does not require any boarding of vessels. Also, when the Inland position was first discussed with Mrs. Cook, the conditions had been radically changed, in that if Mrs. Cook accepted, there would be no weekend rotations and she would have to accept the back-up position and work every weekend. Although this court does not find that this position was changed solely to dissuade Mrs. Cook from accepting the promotion, Mrs. Cook was not given the same facts about the position as was Mr. Silvia. Moreover, Exxon offered Mrs. Cook the position again in May, attaching to it the same terms and conditions when it was obvious that she would not accept it. Both the first discussion and the second offer were part of Exxon's intentional discrimination against Mrs. Cook, to keep her out of the Agency position through the offer of a "safer" desk job.

The purpose of Title VII is to make whole the victims of employment discrimination. *Merriweather et al. v. Hercules, Inc., et al.,* 631 F.2d 1161 (5th Cir.1981), *reh. denied,* 636 F.2d 314 (5th Cir.1981). Title VII provides that

> [i]f the court finds that the [defendant] has intentionally engaged in ... an unlawful employment practice charged in the complaint, the court may ... order such affirmative relief as may be appropriate, which may include, but is not limited to, reinstatement ... of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.

42 U.S.C., § 2000e–5(g). Defendant urges this court to consider plaintiff's duty to

mitigate her damages as provided in that same section of Title VII.

> Interim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise allowable.

*Id.* Exxon contends that when Mrs. Cook was offered the Inland position she had the opportunity to earn the same salary as an Agency T.A. Defendants assert that intervenor's rejection of the Inland T.A. position in May was unreasonable, and thus she failed to mitigate damages. Thus, defendant urges that, because the amounts earnable as an Inland T.A. are the same as an Agency T.A., Mrs. Cook's damage award should be reduced to zero.

■■■ This court recognizes that plaintiff is required to mitigate damages.

> An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g). This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the un- or under employed claimant need not go into another line of work, accept a demotion, or take a demeaning position, [s]he forfeits [her] right to back pay if [s]he refuses a job substantially equivalent to the one [s]he was denied. Consequently, an employer charged with unlawful discrimination often can toll the accrual of back pay liability by unconditionally offering the claimant the job sought, and thereby providing [her] with an opportunity to minimize damages.

*Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721, 732–33 (1982). The offer of the Inland job does not toll the accrual of back pay damages for several reasons. This court has found that the Agency and Inland jobs were only comparable in the sense that they carried the same salary level. Mrs. Cook was not required to accept employment which is not consonant with [her] particular skills, background, and experience" or "which involves conditions that are substantially more oner-

ous than [her] previous position." *Id.* 458 U.S. at 231 n. 16, 102 S.Ct. at 3065 n. 16, 73 L.Ed.2d at 732–33 n. 16 (citing *NLRB v. Madison Kourier, Inc.,* 472 F.2d 1307, 1320–21 (1972)). Mrs. Cook's experience was almost exclusively in Agency. Moreover, she had been working in the marine department for more than fifteen years, it would be a substantially more onerous condition to require her to accept a promotion which required working every weekend to mitigate damages instead of obtaining the promotion to Agency which would have entailed rotating weekends. Offering promotion to a different job is ineffective when the desired position is still available, especially if the offered position had different conditions of employment. *See id.* (citing *Wonder Markets, Inc.,* 236 N.L.R.B. 787 (1976) and *Good Food Manuf. & Processing Corp.,* 195 N.L.R.B. 418, 419 (1972)). Mr. Scott's position was not filled until June 1, 1979. Because the desired position was still available, plaintiff should not have to accept a different job with the onerous condition of working every weekend.

Furthermore, a fundamental difference between *Ford* and the instant case is the employers' intent in making the job offer. In *Ford,* the defendant had no discriminatory intent when it offered the plaintiffs the job they sought; it was merely a strategic financial move to cut losses that back pay awards create for an employer who must pay successful plaintiffs for services they never had an opportunity to render. In this case, this court found that the Inland offer was part of the intent to discriminate. Exxon offered Mrs. Cook that desk job to keep her out of the Agency position which entailed boarding vessels. Mr. Rassinier indicated in late 1978 that Houston management was leary of having a woman in the Agency position. Thus, because the conditions of the Inland position were not the same as Agency, and Exxon's intent behind that offer was to implement its discriminatory plan, Mrs. Cook's rejection of the Inland offer was not unreasonable.

Finally, defendant would require Mrs. Cook to mitigate her damages before the discriminatory act occurred. This court found that when Exxon transferred Mr. Hurtado to Houston on June 1, 1979, defendant discriminated against intervenor on the basis of sex. To mandate that Mrs. Cook mitigate damages and accept a job in May, at least two weeks before Exxon committed the discriminatory act, is to require that she *anticipate* discrimination. This is beyond the intent of § 706(g) or its interpretation in *Ford*.

## ATTORNEY FEES

On January 24, 1984, this court entertained a hearing on attorney fees. Attorney for Intervenor Mr. Gordon Cooper and defense counsel Ms. Melinda Harmon both presented expert witnesses who testified about the (1) time and labor required; (2) the novelty and difficulty of the questions presented at trial; (3) the requisite skill; (4) the customary fee; (5) fixed fees as opposed to contingent fees; (6) the amount involved in the case and the results obtained; (7) the experience, reputation and ability of Mrs. Cook's attorney; and (8) awards in similar cases. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

Considering the evidence presented at the trial and this hearing, this court concludes that it is very difficult for a plaintiff to prove a case of individual discrimination. Mr. Cooper obtained a good result for Mrs. Cook; she is receiving a back pay award of $25,000. plus an increase in her retirement annuity of $346. per month. Mr. Cooper did not have a contingent fee, but accepted a $2,400. retainer from Mrs. Cook. Mr. Cooper has developed experience, ability, and a reputation in the employment discrimination law practice in Houston. Good skills are a requisite to any employment discrimination or civil rights case. Although this court does not find there is a customary fee in these types of cases, it is customary to distinguish between trial preparation and actual trial time. In this case, the court finds Mr. Cooper's trial preparation time to be somewhat excessive, hence, it is reduced to 73⅓ hours at $90.

per hour. His actual trial time is 22 hours at $130. per hour. The court makes this attorneys fee award of $9,460. taking all the above mentioned factors into account, and considering that Mr. Cooper was assisted in preparation for trial by the EEOC attorney, Mr. John Whaley. Furthermore, the court determines that if Mrs. Cook prevails in the event of an appeal, a reasonable attorney fee for the appeal is $2,500.

## CONCLUSION

Mrs. Cook has established a prima facie case, and further established that defendant's reasons were merely pretextual. Consequently, Mrs. Cook is entitled to an award of back pay, based on the difference in pay that Mrs. Cook would have received had she been promoted to the Agency T.A. position awarded to a male employee on June 1, 1979, plus any other monetary benefits that would have flowed to Mrs. Cook. The parties have stipulated to $25,000. in back wages plus interest, and in addition an increase in annuity payments in the amount of $346. per month beginning January 1, 1984, continuing for so long as the Disability Annuity Plan of Exxon provides that an annuity be paid to Mrs. Cook.

Any Findings of Fact which may more properly be denominated as Conclusions of Law are hereby adopted as such. All Conclusions of Law more properly denominated as Findings of Fact are likewise adopted as such.

In accordance with the preceding Findings of Fact and Conclusions of Law, the court hereby ORDERS, ADJUDGES, and DECREES that the Intervenor, Mrs. Avis M. Cook has established a prima facie case under Title VII and is hereby entitled to back pay. Attorney fees are assessed against the defendant in the amount of $9,460.

The attorneys for plaintiff and intervenor are hereby directed to prepare a judgment in conformity with the Findings of Fact and Conclusions of Law, submit it to defense counsel for approval, and then submit it to the court for entry within fifteen (15) days.