**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, DEPARTMENT OF HUMAN SERVICES, Defendant.**

**Civ. A. No. 87–1227.**

United States District Court, District of Columbia.

Jan. 31, 1990.

Douglas A. Gallegos, EEOC, Baltimore District Office, Baltimore, Md., for plaintiff.

Richard D. Albright, Asst. Corp. Counsel, D.C., Washington, D.C., for defendant.

## OPINION

SPORKIN, District Judge.

Plaintiff Equal Employment Opportunity Commission ("EEOC") filed suit against the District of Columbia, Department of Human Services, under the Age Discrimination in Employment Act of 1967 as amended ("ADEA"), 29 U.S.C. § 621 *et seq.* Plaintiff contends that the defendant has violated and continues to violate the ADEA by failing or refusing to hire Dr. Raymond B. Kielich as a public health dental officer because of Dr. Kielich's age. At the time the alleged violation occurred, in the Spring of 1985, Dr. Kielich was 64 years old.

## FINDINGS OF FACT

1. The plaintiff, EEOC, is an agency of the United States government charged, *inter alia*, with the administration, interpretation and enforcement of the ADEA.

2. Defendant is an agency of the government of the District of Columbia and an employer within the meaning of Section 11(b) of the ADEA, 29 U.S.C. § 630(b), through the application of Section 11(i), 29 U.S.C. § 630(i).

3. Dr. Kielich first applied for a position of Dental Officer with Defendant in 1984, in response to Vacancy Announcement DHS 84–141, which announced two vacancies. At the time of this application, Dr. Kielich was 63 years old.

4. A panel of Defendant's officials ranked all persons who applied for the two positions announced. Dr. Kielich was rated "Highly Qualified" by the ranking panel.

5. The Dental Officer positions announced in DHS–84–141 had supplemental ranking factors. Supplemental ranking factors are characterized in the announcements of the positions at issue as highly important to the applicable position. If a position includes supplemental ranking factors, each applicant is asked to provide complete and accurate information that describes "specific incidents of sustained achievements" showing the level at which the applicant meets each of the supplemental ranking factors. The three supplemental ranking factors for DHS–84–141 were:

1. Knowledge of current dental public health practices and their application to the community at large.

2. Ability to provide dental services to a wide spectrum of the population; including the handicapped population, the geriatric population; the pregnant teenage, preschool children, etc.

3. Ability to motivate and supervise personnel.

5. A separate committee of Defendant's officials interviewed Dr. Kielich and five other candidates who had been rated "Highly Qualified" by the ranking panel. The committee did not select any of the six candidates to fill the two announced positions. Instead, by memorandum returning the selection certificate, the Acting Chief of the Bureau of Dental Services indicated that the selection committee "has been unable to select suitable candidates" for the positions. The memorandum also stated that:

Three of the applicants [—] Dr. Black [age 46], Dr. Roger [age 40], and Dr. Kielich [age 63] [—] have distinguished and impressive careers in the field of administration and specialized areas of dentistry. Although they are highly qualified in their respective areas of dentistry, the selection committee does not believe they would serve our basic need of clinical dentists providing basic dental care to the District of Columbia. The remaining three applicants have the necessary qualifications as clinical dentists, but the committee strongly requests the next subgroup of applicants be forwarded to this office so that a representative number of qualified candidates may be interviewed before making the two selections to fill these critically essential positions.

No reason was given why Dr. Kielich would be unable to provide "basic dental care to the District of Columbia."

6. Defendant did not select any candidates for the Dental Officer positions announced in DHS–84–141 in 1984, but instead issued a second announcement of vacancies for the Dental Officer positions in January, 1985. In this second announcement, DHS–85–143, defendant advertised for two temporary positions and four permanent positions.

7. The supplemental ranking factors for the second announcement, DHS–85–143, were:

1. Ability to practice as a clinical dentist on a full-time basis delivering a wide and comprehensive range of dental services.

2. Ability to treat, adapt, and relate to a low income underprivileged inner city population.

3. Ability to provide dental services to a wide spectrum of the population; including the handicapped population, the geriatric population; the pregnant teenager; preschool children, etc.

8. In January, 1985, Dr. Kielich received a letter informing him that the DHS–84–141 position for which he had applied had been withdrawn and that new positions were being advertised under DHS–85–143 for which he could apply.

9. In January, 1985, Dr. Kielich, then 64 years old, applied for both the temporary and permanent positions of Dental Officer.

10. Dr. Kielich submitted a statement of supplemental ranking factors in his standard Form 171 application for the positions advertised in DHS–85–143. Dr. Kielich's statement of supplemental ranking factors demonstrated his broad, comprehensive experience in each of the areas for which supplemental information was requested. Although on the form Supplementary Statement for Medical and Dental Officer, Dr. Kielich listed his experience in general private practice as from 1947 to 1950 and his specialized private practice in pedodontics from 1950 to 1978, Dr. Kielich described the nature of his practice in the space provided as encompassing the full range of dental services including restorative dentistry. Moreover, both Dr. Kielich's responses on the Form 171 application and his separate statement regarding the ranking factors described his private practice from 1947 to 1978 as that of a "dentist" and listed his extensive experience with handicapped and geriatric patients.

11. At the time of his application for the positions announced in DHS–85–143 in January, 1985, Dr. Kielich had 38 years of experience as a practicing dentist.

*Dr. Kielich's Experience*

12. In 1959, Dr. Kielich was certified by the American Board of Pedodontics in the specialty of Pedodontics.[1] Dr. Kielich completed the rigorous examination process and became certified in an extremely short time period for meeting the high standards of this specialty. Pedodontics, one of five specialties in dentistry, is the practice of

---

1. Board certification in a dental specialty is a grueling process that usually requires between five and eight years of dental practice to complete. Many dentists with specialty practices never complete the board certification process, but rather remain "board eligible." Indeed, the testimony at trial indicated that Dr. Kielich was one of approximately eight board-certified pedodontists in the entire Washington, D.C., area.

dentistry on children and mentally and physically handicapped individuals. There is no cut-off age for patients in the practice of pedodontics as the specialty includes treatment of the adult handicapped population.

13. As a specialty of dentistry, pedodontics requires the skills necessary for general dentistry *plus* additional skills needed to treat children and handicapped populations. The Court credits the testimony of Dr. Jaclyn Clarke–Martin and Dr. St. Elmo Crawford, Jr., both Board-eligible pedodontists, that a specialty in pedodontics in no way limits one's ability to treat adults. First, pedodontists perform the same procedures as general dentists but must also perform more complicated procedures because children have two sets of teeth, smaller mouths, and are both less verbal and accepting of dentistry. Second, the specialty of pedodontics includes treatment of young adults and the adult handicapped population.

14. In 1978, Dr. Kielich ended his private practice commenced in 1947 as a general dentist and later as a pedodontist by selling his dental practice in Western New York and accepting an appointment as Director of Pedodontic Training at Children's Hospital National Medical Center in Washington, D.C., with a concurrent appointment to the faculty of Georgetown University School of Dentistry.

15. As Director of Pedodontic Training from 1978 to 1983, Dr. Kielich had a variety of duties. Dr. Kielich was responsible for the operation of the Hospital's out-patient Dental Clinic, where he oversaw the provision of dental care to D.C.'s low-income population. Dr. Kielich was also responsible for supervising undergraduate dental students and directing the training of pedodontic residents by teaching them how to examine, diagnose, and treat a wide range of patients, including handicapped and medically compromised individuals. Dr. Kielich also treated and supervised the treatment of patients under general anesthesia. Additionally, Dr. Kielich was Children's Hospital's primary resource for providing care to children receiving in-patient

treatment. He treated patients whose problems were beyond the skills of the undergraduate dentists and residents; lectured to hospital personnel about dental concerns of the patients; monitored the schedules of dentists assigned to answer emergency calls to back them up as needed; and consulted with medical doctors on their patients' needs. Finally, Dr. Kielich was the Clinical Director of the Adams–Morgan Clinic, an outpatient clinic then operated by Children's Hospital, which provided dental care to the indigent.

16. Dr. Kielich personally treated an average of one to five patients per day at the hospital in either the operating room or in the clinic. The patients Dr. Kielich treated usually required extensive work and he performed multiple procedures in a single session rather than simply performing one or two procedures as would ordinarily be done in a single visit to a dentist.

17. The patient population that Dr. Kielich treated at Children's Hospital was largely a low-income, inner-city population. This population included a number of pregnant teenagers.

18. In his last year at Children's Hospital, budgetary constraints resulted in Dr. Kielich's appointment being reduced to half-time and Dr. Kielich was permitted to supplement his income by using the hospital's facilities for a part-time private practice. In July, 1983, the position that Dr. Kielich held was abolished. Children's Hospital granted him staff privileges, however, so that he could continue to treat the daughter of the now late President Zia of Pakistan.

19. After leaving Children's Hospital, Dr. Kielich continued to treat his immediate family, utilizing the office and equipment of another dentist. He did not consider starting his own private practice again because the cost of equipment and malpractice insurance were prohibitive.

*The Selection Process*

20. A panel of Defendant's officials ranked all persons who applied for the positions announced. Dr. Kielich was again rated "Highly Qualified" by the ranking panel.

21. In March, 1985, a separate committee of Defendant's officials interviewed Dr. Kielich and other candidates who had been rated "Highly Qualified" by the ranking panel. The interview panel was the same as that which had interviewed Dr. Kielich in 1984 with the exception of one member. The panel was again chaired by Dr. Robert Quaranta, the selecting official for the appointments and Acting Deputy Chief of the Bureau of Dental Health Services. The panel included two other supervisory dentists and one practicing dental officer, all employed by Defendant.

22. Dr. Kielich and certain other applicants rated "Highly Qualified" were not considered for the permanent positions advertised under DHS–85–143 because they indicated that they would be willing to accept temporary positions.

23. The Court credits the testimony of Dr. Kielich, who kept meticulous contemporaneous notes, concerning the substance of his second interview with the panel. Many of the panel's questions involved Dr. Kielich's ability to speak Spanish and whether he would be willing to establish residency in D.C. Dr. Kielich was also asked whether he had been practicing "wet finger" dentistry at Children's Hospital and his experience with dentures; he explained to the panel that he had indeed been practicing clinical dentistry throughout his term at Children's Hospital and had made "hundreds" of dentures. The panel did not ask Dr. Kielich about his job history prior to his position at Children's Hospital nor about his experience treating adult patients, geriatric patients, pregnant teenagers, or individuals from low income populations.

24. Five candidates were interviewed for the temporary Dental Officer positions. Defendant selected two dentists from this pool: Dr. Anita Greene, age 31; and Dr. Candace Mitchell, age 28. Both selectees had less than four years experience as dentists. Although the two selectees were hired as temporary Dental Officers, they have been employed continuously by defendant since their selection.

25. On at least one of the days when interviews were conducted, Dr. Quaranta recorded the ages of all candidates interviewed on that day in his interview notes.

26. Defendant selected two dentists, ages 46 and 34, for the permanent positions. One selectee had less than four years experience as a dentist, the other less than seven years. The remaining two permanent positions Defendant announced would not be filled, as those slots had been withdrawn.

27. On May 9, 1985, Dr. Kielich learned that he was not selected for any of the Dental Officer positions announced in DHS–85–143.

28. Dr. Kielich made numerous attempts to seek further employment as a dentist after being notified that he was not selected as a Dental Officer. Indeed, both Dr. Kielich's testimony and the detailed contemporaneous notes he kept of his job search efforts demonstrate that until 1988 he seriously attempted to obtain employment as a dentist after his position at Children's Hospital was terminated. The Court notes that defendant introduced no evidence that Dr. Kielich failed to mitigate his damages. Dr. Kielich is presently employed as a part-time photography clerk at $4.50 an hour.

29. After learning that he was not selected as a Dental Officer, Dr. Kielich filed a timely charge of employment discrimination based on age with the EEOC's Washington Office.

30. On May 5, 1987 the EEOC filed the suit currently before the Court on behalf of Dr. Kielich.

### CONCLUSIONS OF LAW

The Court of Appeals has explained that in an action under the ADEA:

> the plaintiff's ultimate burden is to prove that age was "a determining factor" in the challenged employment decision ... The plaintiff must prove that "age made a difference in the employer's decision" ... in the sense that, "but for" the discriminatory motive, the employee would have been hired, promoted, or retained.

*Krodel v. Young,* 748 F.2d 701, 706 (D.C. Cir.1984), *cert. denied,* 474 U.S. 817, 106

S.Ct. 62, 88 L.Ed.2d 51 (1985) (citations omitted). To determine whether a plaintiff has met this ultimate burden, the Court of Appeals has adopted the tripartite test for Title VII cases articulated by the Supreme Court in *McDonnell–Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Krodel*, 748 F.2d at 705, *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342–43 (D.C.Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983), *Cuddy v. Carmen*, 694 F.2d 853, 856–57 (D.C.Cir.1982).

The plaintiff must first establish a *prima facie* case of discrimination through proof of sufficient facts to create a reasonable inference that "... age was a factor in the employment decision at issue." *Krodel*, 748 F.2d at 705. Once the *prima facie* case has been made, the employer bears the "burden" of putting forward a legitimate, non-discriminatory basis for its decision. Should the employer meet this burden, the plaintiff must then show that the employer's rationale is merely pretextual, which he can do "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

A plaintiff can establish a *prima facie* case of discrimination by demonstrating that the individual: (1) belongs to the statutorily protected age group; (2) was qualified for the position; (3) was not hired; and (4) was disadvantaged in favor of a younger person. *Cuddy*, 694 F.2d at 856–57; *Coburn*, 711 F.2d at 342. Plaintiff has carried his burden on each of these points and thus has made out a *prima facie* case.

■ First, Dr. Kielich was 64 years old when he applied for the positions announced in DHS–85–143 and thus, clearly was within the statutorily protected age group. *See* 29 U.S.C. § 631(b).

Second, there is abundant evidence that Dr. Kielich was qualified for the position as Dental Officer.[2] Indeed, Dr. Kielich was rated "Highly Qualified" by defendant's own ranking panel. Furthermore, none of the testimony offered by the five members of the selection committee that interviewed Dr. Kielich suggested that Dr. Kielich was unqualified or even that they considered him unqualified. Rather, the members of the selection committee were virtually unanimous in evaluating Dr. Kielich as "over-qualified." The Court finds Dr. Kielich was amply qualified for the positions. Dr. Kielich's work experience, his own testimony, as well as the testimony of other dentists who had worked closely with him and observed his clinical skills all demonstrate that he had superb qualifications.

Third, it is undisputed that despite his qualifications, Dr. Kielich was not chosen for a position as a Dental Officer.

Finally, it is also undisputed that the two selectees for the Temporary Dental Officer positions were age 28 and age 31 and thus, were significantly younger than Dr. Kielich.[3]

---

2. It was unclear throughout the trial whether defendant seriously disputed that the EEOC had established a *prima facie* case of age discrimination. Although in his opening argument, defendant's counsel suggested that the EEOC had not established a *prima facie* case, no evidence was introduced to suggest Dr. Kielich was unqualified for the position and, in fact, defendant's own witnesses testified to the contrary. Moreover, the thrust of defendant's argument was that the eventual selectees for the Dental Officer positions were *better* qualified than Dr. Kielich.

3. The EEOC has argued that the Court should consider defendant's failure to hire Dr. Kielich for the permanent Dental Officer positions as well as for the two temporary positions. *See* Plaintiff's First Supplemental Proposed Findings of Fact and Conclusions of Law. The Court finds, however, that defendant's failure to consider Dr. Kielich for a permanent position was the result of its practice of considering applicants willing to accept temporary positions for temporary positions *only*, thereby precluding consideration of such applicants for permanent positions. While such a policy may not have been wise, there is no evidence that it was discriminatory. Moreover, the evidence introduced at trial focused on Dr. Kielich's qualifications for the temporary positions. Thus, the Court has only given consideration to defendant's failure to hire Dr. Kielich for a position as Temporary Dental Officer.

Because a *prima facie* case has been established, the burden shifts to the employer who bears the "burden of 'producing evidence' tending to show that the plaintiff was denied employment or promotion for a legitimate nondiscriminatory reason." *Krodel*, 748 F.2d at 705. Defendant contends that the selectees were *better* qualified than Dr. Kielich because they had current full time general dentistry experience, had no recent gap in their respective practices, and had experience in performing root canal surgery, fitting dentures, and treating low-income and older populations. Defendant also asserts that the two selectees were chosen, in part, because their work was known to the selection panel and they had in their private practices served the same population as would be treated by a Temporary Dental Officer. One selectee had worked in defendant's clinic as a volunteer for several months and the other selectee had worked in an inner city clinic well known to the selection panel.[4]

The Court is not persuaded that defendant has met its burden. As discussed below, the testimony offered by the individual members of the selection panel suggested that the reason Dr. Kielich was not selected was because the individual panel members believed that the position for which Dr. Kielich applied was "entry level" and that Dr. Kielich was simply overqualified. That a dentist of Dr. Kielich's impressive background and credentials did not conform to the stereotype for an "entry level" position is not a legitimate, nondiscriminatory reason for defendant's employment decision. Even assuming, however, that defendant has met its burden, the Court finds that plaintiff has provided extensive evidence that defendant's proffered reasons for failing to hire Dr. Kielich were pretextual.

First, as discussed above, the evidence at trial demonstrated that Dr. Kielich was exceptionally qualified for the positions. It is true that in the recent months prior to the selection, Dr. Kielich had not been practicing dentistry on a full time basis. Nevertheless, the testimony at trial indicated that a short gap in practice would have no effect on a dentist's ability to treat patients and, in fact, such gaps are quite common: For example, dentists often take a short hiatus from practicing to teach or take maternity leave with no ill effect on their skills.[5] The Court simply does not find credible defendant's explanation that two dentists with less than four years experience had preferable general dentistry experience compared to Dr. Kielich's 38 years of experience.[6]

The Court is particularly disturbed by defendant's reliance on Dr. Kielich's gap in fulltime practice as a justification for its employment decision. The testimony at trial indicated that Dr. Kielich was unable to obtain employment as a dentist after leaving Children's Hospital because of his age. The actions of the other employers, both

---

**4.** Defendant attempted to introduce statistical evidence to show that defendant's work force of clinical dentists reflects a population older than the applicants for the vacancies announced in DHS–85–143. *See* Defense Exhibit 19. As the Supreme Court has emphasized, statistics "come in infinite variety and, like other kinds of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). In the instant case, defendant's statistics are of little relevance. First, defendant offered no statistical expert to produce competent statistical evidence. Second, the Court notes that on its face the statistical evidence offered is insufficient as it only relates to the age of defendant's *current* work force, not the age at which clinical dentists were actually *hired*.

**5.** The Court also notes that Dr. Kielich had continued to treat patients after his position at Children's Hospital was terminated and indeed was granted staff privileges (including insurance coverage) at Children's Hospital to treat President Zia's daughter. Moreover, the panel did not express any concern that Dr. Kielich might have "lost" his skills during his interview.

**6.** The Court also notes that the supplemental ranking factor requiring "ability to practice as a clinical dentist on a full-time basis" was added as a supplemental ranking factor only after Dr. Kielich had applied in response to DHS–84–141. *See infra* for discussion on impact of Dr. Kielich's first application.

**914**

private and public, who rebuffed Dr. Kielich's attempts to obtain employment are not at issue in this case. Yet, to allow defendant to rely on Dr. Kielich's gap in dental employment, which itself resulted from age discrimination, as a legitimate, nondiscriminatory reason for its employment decision would set the ADEA on its head. The Court's finding that the gap in Dr. Kielich's practice was generated by the very type of discrimination at issue in this case is another, perhaps more important, reason that defendant's proffered rationale ought not be given much weight.

Moreover, the Court rejects defendant's assertion that Dr. Kielich lacked recent experience in several areas of general dentistry, thus raising the possibility that he needed training in newer techniques. See Defendant's Post Trial Proposed Findings of Fact and Conclusions of Law at 12. No evidence to support such a conclusion was introduced at trial. It belies reason to suggest that Dr. Kielich, who had most recently been employed as Director of Pedodontic Training at Children's Hospital and, therefore, responsible for training and teaching treatment techniques to young dentists, lacked the ability to perform new or difficult procedures.[7]

The Court also finds pretextual defendant's proffered rationale that Dr. Kielich had less experience with low income and older populations than did the two selectees. It is undisputed that the patient population that Dr. Kielich treated as Children's Hospital was largely a low income, inner city population. Dr. Kielich expressly noted this fact on his supplemental ranking factor statement submitted with his application. Moreover, his application amply documented his extensive experience during 38 years of practice treating geriatric and adult populations. The interview panel did not ask Dr. Kielich any questions concerning the different types of populations that he had treated throughout his career, further suggesting that defendant's proffered reason did not play a genuine role in the employment decision, but rather was a *post hoc* rationalization.

Similarly, the Court finds defendant's proffered explanation that the panel believed Dr. Kielich had less experience than the two selectees in treating adult gum disease (including performing root canal and treating "dry sockets") and fitting full dentures pretextual. Again, the Court notes that Dr. Kielich had extensive experience both in treating adults and in performing the procedures at issue. Furthermore, this experience was clearly noted on his application. While the interview panel did ask Dr. Kielich about his experience fitting dentures, they did not ask about gum disease nor did they inquire about his general experience in treating adult and geriatric populations.

The Court's conclusion that defendant's explanations for its employment decision are pretextual and that its failure to hire Dr. Kielich was the result of age discrimination is supported by two additional factors. First, the testimony of defendant's own selection panel supports the Court's conclusions. Second, defendant's treatment of Dr. Kielich's first application for employment is also illuminating for it contradicts the very position defendant now asserts.

The Court turns first to the testimony offered by the individual members of defendant's selection panel. The members of the selection panel—Dr. Quaranta, Dr. Rollins, and Dr. Young—testified that Dr. Kielich was "over qualified" or "too qualified" for the open positions.[8] The substance of

---

7. Defendant also asserted that Dr. Kielich may have been unable to work full time because while at Children's Hospital he had only treated 1–5 patients per day and at defendant's clinic he might have been required to treat as many as twelve patients per day. As the Court has noted, Dr. Kielich's treatment of patients at Children's Hospital involved multiple procedures in a single session rather than the one or two procedures that may be performed in an ordinary clinic visit. Furthermore, the interview panel did not inquire about Dr. Kielich's ability to treat a dozen patients a day.

8. The only exception to this testimony came from the fourth member of the panel and its only clinical member, Dr. Haden D. Williams, who testified that Dr. Kielich was "well qualified" for the position and that he felt Dr. Kielich was able to do the job. Dr. Williams could not

their testimony was that Dr. Kielich was "over qualified" and "over specialized" for what they considered to be entry level positions. Indeed, in the words of Dr. Frances Young, the selection panel was looking for "troops in the trenches;" therefore, the panel wanted "privates not sergeants." In Dr. Young's view, Dr. Kielich was a "general."

The Court believes that individual members of the selection panel had preconceived notions about what a successful candidate for an "entry level" position would look like which did not include a 64 year old dentist with almost 40 years of experience. Rather, the members of the panel seem to have envisioned that the "entry level" positions would be filled by recent dental school graduates. Such stereotypes work to the detriment of the older applicant, such as Dr. Kielich, who has graduated from school long ago and in the interim gained years of valuable hands-on experience. Indeed, the very term "over qualified and over specialized" is almost a buzzword for "too old." It is only with time that one can gain the experience necessary to amass impressive credentials or to specialize in a particular professional field. The Court is unable to conceive of how Dr. Kielich might have been "over qualified" for the position and yet other (younger) applicants deemed "better qualified."

The Court also finds defendant's treatment of Dr. Kielich's first application for a Dental Officer position quite telling. When Dr. Kielich first applied for a position in 1984, the selection committee concluded, without explanation, that it "does not believe [Dr. Kielich] would serve our basic need of clinical dentists providing basic dental care to the District of Columbia." Defendant now asserts that Dr. Kielich's 1985 application was rejected in favor of other candidates not because Dr. Kielich would be unable to provide basic dental care, but because the two candidates chosen were better qualified, their work was

known to the panel, and in their then existing positions they had treated the same population treated in defendant's clinics. Yet, Dr. Kielich's qualifications did not change between his 1984 and 1985 applications.[9] Rather than select candidates from the 1984 applicants, defendant scrapped the entire selection process and started anew.

Defendant correctly notes that Dr. Kielich never filed a charge of discrimination based on the rejection of his 1984 application. Therefore, the question of whether defendant's failure to hire Dr. Kielich in 1984 constituted age discrimination is not before the Court. Nevertheless, defendant's response to Dr. Kielich's earlier application is highly relevant as it tends to contradict the proffered reasons for defendant's rejection of Dr. Kielich in 1985. It is quite clear that from the very start defendant did not want any part of this extraordinary, highly qualified 64 year old dentist. Thus, the Court finds that the EEOC has produced clear evidence, including discrepancies in the defendant's proffered explanation, to prove that defendant was motivated by illegitimate reasons to reject Dr. Kielich's application. *See Krodel*, 748 F.2d at 707. Accordingly, the Court finds that plaintiff has met its burden of proving that Dr. Kielich was discriminated against because of his age in violation of the ADEA.

*Remedy*

The Court now turns to consideration of an appropriate remedy. The EEOC seeks immediate instatement of Dr. Kielich to a Dental Officer position with appropriate seniority, back wages and prejudgment interest. It also requests liquidated damages, equal to the amount of back pay, for defendant's alleged "willful" violation of the ADEA under 29 U.S.C. § 626(b). Also sought is an injunction against future violations of the ADEA and an order requiring defendant to post a Notice to employees outlining the steps it plans to take in order

---

recall any reason why he might have chosen the two selectees rather than Dr. Kielich for the open positions.

**9.** In fact, the only material difference between his two applications, besides different statements for the supplemental ranking factors, was that in 1984, Dr. Kielich had *less* of a gap in his recent work experience.

to ensure future compliance with the ADEA.

■ The Court finds that Dr. Kielich is entitled to instatement under section 7(b) of the ADEA, 29 U.S.C. § 626(b). Because the defendant, from time to time, has a need for qualified dental officers, the Court will not order that the present incumbents in the positions in question be removed from their positions to make room for Dr. Kielich. *See Lander v. Lujan*, 888 F.2d 153, 156 (D.C.Cir.1989). Instead, the Court will deem this part of the remedy satisfied if within thirty (30) days of this Order Dr. Kielich is instated to a suitable dental position.

■ Dr. Kielich is also entitled to an award of back pay since back wages are a standard element of full relief in ADEA suits. *See e.g., Anastasio v. Schering Corp.*, 838 F.2d 701, 708 (3rd Cir.1988). Defendant asserts that Dr. Kielich failed to mitigate his damages and thus, his back pay award should be adjusted accordingly. The duty to mitigate damages in an employment discrimination case only "requires the claimant to use reasonable diligence in finding suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982). Defendant has the burden of showing that Dr. Kielich failed to mitigate his damages by establishing: (1) that there were suitable positions available which Dr. Kielich could have obtained, and (2) that Dr. Kielich failed to use reasonable diligence in seeking them out. *See Jackson v. Shell Oil Co.*, 702 F.2d 197, 202 (9th Cir.1983). Defendant did not satisfy its burden of demonstrating that Dr. Kielich failed to adequately mitigate his damages. To the contrary, the Court finds that Dr. Kielich made every reasonable effort to mitigate damages. In particular, the Court does not find it unreasonable for Dr. Kielich to have accepted a part-time job as a photography clerk after having been unsuccessful in his several-year search for work in dentistry.

Dr. Kielich is entitled to back wages in the amount he would have received in monetary and fringe benefits had he been hired, less what he received in wages from other employment. *See* 3 Eglit, *Age Discrimination* § 18.04 at 18–17 (1982). In addition, Dr. Kielich is entitled to prejudgment interest. *See e.g., Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 282 (2d Cir.1987). By statute, interest on judgments against the District of Columbia, its officers, or employees acting within the scope of employment cannot exceed a rate of 4 percent per annum. D.C.Code Ann. § 28–3302 (Supp.1989). Therefore, defendant must pay Dr. Kielich prejudgment interest of 4 percent.

■ The EEOC also seeks liquidated damages. The ADEA expressly incorporates the remedial provisions of the Fair Labor Standards Act, 29 U.S. § 216(b). 29 U.S.C. § 626(b). Under these remedial provisions, a violating employer is liable for wages and benefits from the date when the successful applicant was hired until the date of trial, as well as "an additional equal amount as liquidated damages" if the violation was "willful". 29 U.S.C. §§ 216(b), 626(b). In *Trans World Airlines v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), the Supreme Court held that an ADEA violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Id.* at 128–29, 105 S.Ct. at 625.

The Circuit courts have had considerable trouble in applying the *Thurston* standard for willfulness to individual discrimination cases.[10] For example, the Third Circuit has held that liquidated damages may only be awarded in cases where the employer has committed "outrageous" conduct. *See Dreyer v. ARCO Chemical Co.*, 801 F.2d 651, 658 (3rd Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987). In contrast, the Eleventh Circuit has concluded that "[t]here is no logical way to square a finding of intentional discrimination with a finding of good faith on the employer's part." *Lindsey v. Ameri-*

---

**10.** The D.C. Circuit Court of Appeals has yet to rule on this issue.

*can Cast Iron Pipe Co.*, 810 F.2d 1094, 1100 (11th Cir.1987). Thus, in effect, the Eleventh Circuit has only required a minimal showing once intentional discrimination has been demonstrated. *Id.* The Fourth, Eighth, Sixth and Tenth Circuits, while requiring a greater standard for willfulness than the Eleventh Circuit, have refused to adopt the "outrageous" standard of the Third Circuit. *See e.g., Gilliam v. Armtex, Inc.*, 820 F.2d 1387, 1390–91 (4th Cir.1987) (requiring consideration of employer's business justification); *Uffelman v. Lone Star Steel Co.*, 863 F.2d 404, 409–10 (5th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989) (weighing credibility of witnesses regarding employer's good faith and reasonable actions); *Schrand v. Federal Pacific Electric Co.*, 851 F.2d 152, 158 (6th Cir.1988) (age must be "predominant factor in the employer's decision" in order to find willfulness); *MacDissi v. Valmont Industries*, 856 F.2d 1054, 1061 (8th Cir.1988) (requiring evidence of a conscious intent to violate the law); *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1551 (10th Cir.1988) (age must be "predominant factor in the employer's decision" in order to find willfulness).

The Court concludes that some evidence in excess of that necessary to establish a violation is needed to support a finding of willfulness. In applying this standard, the Court does not believe the plaintiff has met its burden and will not assess liquidated damages against the defendant.

█ Finally, the EEOC seeks injunctive relief. Injunctive relief is appropriate under section 7(b) of the ADEA, 29 U.S.C. § 626(b), which incorporates section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217. *See Hodgson v. First Federal Savings and Loan Ass'n*, 455 F.2d 818, 825 (5th Cir.1972). The Court believes that an injunction in this case is appropriate. It is clear from these facts that defendant must revise its conception of entry level Dental Officer appointments. The defendant must understand that the ADEA means what it says. Defendant cannot include in its hiring pool only those who are recent dental graduates for its entry level Dental Officer positions. The Court will also issue an Order requiring defendant to post an appropriate Notice to employees, in terms and scope approved by the EEOC and this Court, outlining the steps it plans to take in order to ensure future compliance with the ADEA.

These are my findings of fact and conclusions of law. Any finding of fact which constitutes a conclusion of law is hereby adopted as such, and any conclusion of law which constitutes a finding of fact is hereby adopted as such.

A separate Order shall accompany this Opinion.

### ORDER

Upon consideration of the evidence and testimony presented at trial, the arguments of counsel, and in accordance with the Court's opinion of this date, it is hereby

ORDERED that judgment be and hereby is entered for the plaintiff; and it is

FURTHER ORDERED that within thirty (30) days from the issuance of this order, defendant instate Dr. Kielich to an appropriate Dental Officer position with full seniority and other benefits; and it is

FURTHER ORDERED that defendant pay Dr. Kielich back wages and prejudgment interest at four percent (4%); and it is

FURTHER ORDERED that defendant, its officers, agents, servants, and employees are enjoined from violating the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), by failing to appropriately consider and hire applicants for the position of Dental Officer because of their age; and it is

FURTHER ORDERED that defendant shall, within thirty (30) days, post an appropriate Notice to employees, in terms and scope approved by the EEOC and this Court, outlining the steps it plans to take in order to ensure future compliance with the ADEA.